**Cecelia YIN, Plaintiff–Appellant,**

**v.**

**STATE OF CALIFORNIA; Daryll Tsujihara; Linda Nicholson; Robert Catale; and Tony Sunseri, Defendants–Appellees.**

**No. 94–17057.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 13, 1996.

Decided Sept. 11, 1996.

Donna Timmerman, San Jose, California, for plaintiff-appellant.

Angela Botelho, Deputy Attorney General, San Francisco, California, for defendants-appellees.

Before: REINHARDT, THOMPSON, and O'SCANNLAIN, Circuit Judges.

Opinion by Judge REINHARDT; Special Concurrence by Judge O'SCANNLAIN.

REINHARDT, Circuit Judge:

The question before us is whether the state may compel an employee with a prolonged and egregious history of absenteeism and a record of on-the-job illnesses to undergo a fitness-for-duty medical examination. California's civil service statute specifically authorizes such tests, as does the employee's

union contract. The employee claims that requiring her to submit to an unwanted medical examination would violate both the American with Disabilities Act (the ADA), 42 U.S.C. § 12101 *et seq.* and the Fourth Amendment. We disagree on both counts.

## Background

The plaintiff, Cecelia Yin, works as a tax auditor for the State of California Employment Development Department. For five years before the commencement of this action, Yin used sick leave, vacation time in lieu of sick leave, and dock time in lieu of sick leave at rates far in excess of the average for tax auditors. The record shows the following: In 1989 and 1990, due to illness Yin missed approximately two and one half times as much work as the average auditor. In 1991, she missed about 20% more work, and in 1992 and 1993 respectively, she missed five and six times as much. She missed nearly four full months of work in 1993. Because of her excessive absenteeism, Yin's overall productivity, whether measured in terms of the numbers of audits completed or additional tax liability found, was less than any or almost any of the other auditors working out of the San Jose district office for four straight fiscal years, from 1989 to 1993.

In May 1993, when Yin returned to work from yet another absence, one of her supervisors requested that she provide a copy of her medical records. Yin refused, and after several more absences, her supervisor asked her to submit to an independent medical examination to be administered by a doctor selected by the state. Again Yin refused, and this time she retained a lawyer. The state dropped its request, saying Yin's condition had stabilized. In February 1994, after several more absences, including one stretch during which Yin missed almost 30 days in a row, the state again demanded that Yin sub-

mit to an independent medical examination. This time Yin filed suit to keep the state from requiring her to release her medical records, submit to an examination, or discipline her for refusing to do so.

■ On summary judgment, the district court ruled for the state on all claims. The court held that even if the requested examination were for the purpose of determining whether or not Yin was disabled, a purpose that is normally prohibited by the ADA, it would be exempt from the prohibition because it fell under the business necessity exception.[1] The court also held that the requirement that Yin submit to the examination did not violate her Fourth Amendment rights. This appeal ensued.[2]

## Medical Examinations, the ADA and the Business Necessity Exception

The ADA was enacted in 1992 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."[3] The act drew heavily upon the language and structure of the Rehabilitation Act of 1973, which prohibits discrimination against handicapped individuals employed by the federal government or in federal programs. In sections 12201(a) and 12133 of the ADA, Congress directed that interpretations of the ADA incorporate Rehabilitation Act precedent.

■ Section 12112(d)(4)(A) of the ADA provides that covered entities shall not require medical examinations of their employees for the purpose of determining "whether such employee is an individual with a disability or as to the nature and severity of the disability" unless the examination "is shown to be job-related and consistent with business necessity". This court has not yet construed this section in general or the scope of

---

1. 42 U.S.C. § 12112(d)(4)(A) says: "A covered entity shall not require a medical examination and shall not make medical inquiries of an employee as to whether such an employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity."

2. Because Yin claims that the medical examination was requested for a prohibited purpose, she falls within the zone of interest protected by the statute and thus has standing to bring this action. *See Valley Forge Christian College v. Americans for Separation of Church and State, Inc.,* 454 U.S. 464, 474–75, 102 S.Ct. 752, 759–60, 70 L.Ed.2d 700 (1982).

3. 42 U.S.C. § 12101(b).

its business necessity exception in particular.[4] We have, however, in one case, considered the definition of business necessity as used in regulations implementing the Rehabilitation Act. That case is not of much assistance here.[5]

Like the district court, we assume for the purpose of our analysis that a goal of the proposed medical examination was to determine whether Yin was "an individual with a disability or ... the nature or severity of [her] disability" and that the proposed examination is subject to 42 U.S.C. § 12112(d)(4)(A). Even with that assumption, we conclude that in light of the business necessity exception the ADA does not prohibit the state from requiring Yin to undergo the requested medical examination.

There is no question that the proposed medical examination was job-related. The record clearly indicates that Yin's supervisors had good cause for trying to determine whether she was able to perform her job. Yin had missed an inordinate number of days at work. The undisputed facts show that Yin's excessive absenteeism had taken a seri-

ous and deleterious toll on her productivity and overall job performance.[6] There is nothing in the record to suggest that her supervisors were simply trying to discover whether she suffered from a particular disability or that they harbored either a special bias against individuals with a given disability or a general bias against all persons with disabilities. Moreover, according to the record before us, there is no doubt that Yin's supervisors' ultimate purpose was only to try to determine whether Yin was capable of doing her job. Although the terms of the statute and the interpretive regulations are far from clear, we do not believe that Congress intended as sweeping a ban on employee medical examinations as appellant suggests.[7] We conclude that when health problems have had a substantial and injurious impact on an employee's job performance, the employer can require the employee to undergo a physical examination designed to determine his or her ability to work, even if the examination might disclose whether the employee is disabled or the extent of any disability.[8] If such an examination is governed by the provisions of

---

**4.** The ADA was adopted in 1990 and took effect in 1992.

**5.** *Bentivegna v. U.S. Dept. of Labor*, 694 F.2d 619 (9th Cir.1982), considered whether an employee with diabetes could be fired merely because the employer believed the employee's blood sugar level was not under control and that the employee was thus more prone than the average employee to health problems. In the course of the opinion, we interpreted 29 C.F.R. § 32.14 (1982), which provides that job qualifications "which would tend to exclude handicapped individuals because of their handicap ... shall be related to the specific job or jobs for which the individual is being considered and shall be consistent with business necessity and safe performance." We noted that "business necessity is not to be confused with mere expediency." *Id.* at 622. *See also Mantolete v. Bolger*, 767 F.2d 1416 (9th Cir.1985) (quoting "mere expediency" language from *Bentivegna*).

**6.** The district court reached a similar conclusion, stating: "Although Plaintiff contends that the Defendants here have not made such a showing of 'business' necessity, the Court disagrees. The declarations of Tony Sunseri and Robert Catale set forth in detail Plaintiff's excessive absenteeism rate and the effect such absenteeism has on the work load of both Plaintiff and her office."

**7.** The interpretive regulation covering medical examination discusses an example that is similar

in some respect to the case before us. However, in the end the discussion is of little or no help and the interpretation leaves us exactly where we were before. *See* 29 C.F.R. Pt. 1630 App. (Interpretative Guidance on Title I of the Americans with Disabilities Act). "The purpose of this provision is to prevent the administration to employees of medical tests or inquiries that do not serve a legitimate business purpose. For example, if an employee suddenly starts to use increased amounts of sick leave or starts to appear sickly, an employer could not require that employee to be tested for AIDS, HIV infection, or cancer unless the employer can demonstrate that such testing is job-related and consistent with business necessity." *Id.* at § 1630.13(b).

**8.** Yin claims that she would be subjected to a vaginal examination as part of the requested independent medical examination. She does not, however, provide any evidence to that effect and the state vehemently denies her contention. As evidence, the state offered a declaration from Dr. Duncan, the doctor that the state wanted to examine her. In his declaration, the doctor said that in cases of dizziness, the condition from which Yin was suffering, he does not perform a pelvic examination. Accordingly, we conclude that there is no material dispute of fact as to the scope of the examination.

§ 12112(d)(4)(A), it is covered by the business necessity exception.

## Medical Examinations and the Fourth Amendment

 Yin also claims that defendants' insistence that she undergo an independent medical examination constitutes a violation of her Fourth Amendment right to be free from unreasonable searches and seizures. Yin further argues that the state must secure a warrant before it can compel her to submit to a medical examination. We reject both contentions.

 Although a search or seizure is usually not considered to be consistent with constitutional requirements unless it is conducted pursuant to a warrant issued upon probable cause, *Vernonia School Dist. 47J v. Acton*, —— U.S. ——, ——-——, 115 S.Ct. 2386, 2390–91, 132 L.Ed.2d 564 (1995); *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989), neither probable cause nor a warrant is required when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." *Vernonia*, —— U.S. at ——, 115 S.Ct. at 2391 (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S.Ct. 3164, 3168, 97 L.Ed.2d 709 (1987) (internal quotation marks omitted)). In "special needs" cases, a category that includes criminal and civil proceedings, the Court dispenses with the probable cause and warrant requirements and simply applies a balancing test to determine if a search or seizure is reasonable and thus constitutional. *See O'Connor v. Ortega*, 480 U.S. 709, 725, 107 S.Ct. 1492, 1501, 94 L.Ed.2d 714 (1986) (plurality) (holding neither the warrant requirement nor the probable cause requirement should apply to "non-investigatory, work-related purposes," or "for investigations of work-related misconduct" ... ); *see also New Jersey v. T.L.O.*, 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985) (upholding warrantless search of student's purse because of need to maintain discipline in schools).

 Medical examinations and medical tests that are not conducted as part of a criminal investigation are generally subject to the balancing test, not the warrant/probable cause requirement. *Vernonia*, —— U.S. at ——, 115 S.Ct. at 2391; *Skinner*, 489 U.S. at 618–21, 109 S.Ct. at 1414–15; *National Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665, 109 S.Ct. 1384, 1390, 103 L.Ed.2d 685 (1989). The medical test at issue here, if justified at all, "serves special governmental needs [ ] beyond the normal need for law enforcement ..." Thus, we reject Yin's claim that the state must secure a search warrant before requiring her to submit to a medical examination.

In several special needs cases, the Court has concluded that "in limited circumstances" a warrantless search or seizure may be reasonable even absent individualized suspicion. *See Von Raab*, 489 U.S. at 668, 109 S.Ct. at 1392 ("We think the Government's need to conduct the suspicionless searches required by the Customs program outweighs the privacy interests of employees engaged directly in drug interdiction, and of those who otherwise are required to carry firearms."); *Skinner*, 489 U.S. at 624, 109 S.Ct. at 1417 ("In limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion."). We do not have to decide here, however, whether the state could compel Yin or its other employees to submit to a medical examination without individualized suspicion, because as we explain below, individualized suspicion clearly exists in Yin's case.[9]

9. California statute § 19253.5 says the state "may require an employee to submit to a medical examination by physician or physicians ... to evaluate the capacity of the employee to perform the work of his or her position." *Id.* at (a). The statute does not specify whether the state must have an individualized suspicion before requesting an independent medical examination.

In this case the union contract limits the application of the statute to situations in which the state has an individualized suspicion. The contract says, in pertinent part, that the state may require a medical examination "[w]henever the

Under the balancing test, the Court determines if a search is reasonable by weighing the privacy interests of the individual against the government's interest in the search. *Vernonia*, —— U.S. at ——, 115 S.Ct. at 2390. Notwithstanding Yin's assertion to the contrary, the government does not have to use the least restrictive means to further its interests. *Vernonia*, —— U.S. at ——, 115 S.Ct. at 2396 ("We have repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment.") Nor must the government establish a "compelling state interest," in the sense of an absolute quantum of interest, to justify the search or seizure. As Justice Scalia explained in *Vernonia*:

> It is a mistake, to think that the phrase "compelling state interest," in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering the question: Is there a compelling state interest? Rather, the phrase describes an interest which appears *important enough* to justify the particular search at hand, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy.

*Id.* at —— – ——, 115 S.Ct. at 2394–95.

### Yin's Privacy Interest

Requiring someone to submit to a medical examination invades an expectation of privacy that "society is prepared to consider reasonable," *Ortega*, 480 U.S. at 715, 107 S.Ct. at 1496, and thus clearly implicates the Fourth Amendment. The Court has previously held that blood tests, urinalysis, and breathalyzer tests are searches implicating Fourth Amendment rights. *Skinner, Von Raab, Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

In *Skinner*, the Court also said the act of drawing blood itself, even if the blood is not subsequently analyzed for the presence of illegal drugs, implicates the Fourth Amendment:

> In light of our society's concern for the security of one's person, *see, e.g. Terry v. Ohio*, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968), it is obvious that this physical intrusion, penetrating beneath the skin, infringes an expectation of privacy that society is prepared to recognize as reasonable. The ensuing chemical analysis of the sample to obtain physiological data is a further intrusion of the tested employee's privacy interests.

*Skinner*, 489 U.S. at 616, 109 S.Ct. at 1412. Similarly in *Vernonia*, the Court said that both the collection of a urine sample, as well as its subsequent analysis, are invasions of societally-sanctioned expectations of privacy. *Vernonia*, —— U.S. at ——, 115 S.Ct. at 2393.

Supreme Court precedent clearly dictates that any medical examination that entails a blood or urine test triggers, at a minimum, the Fourth Amendment balancing test. In today's world, a medical examination that does not include either a blood test or urinalysis would be unusual. Nonetheless, any such medical examination would still implicate the Fourth Amendment.[10] The Court held in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), for instance, that even a brief detention and frisk constitutes a search or seizure under the Fourth Amendment. *Id.* at 16, 88 S.Ct. at 1877. A physical examination by a doctor, with or without the *taking of bodily fluids*, is surely far more intrusive.

We have previously held that individuals have a right protected under the Due Process Clause of the Fifth or Fourteenth Amendments in the privacy of personal medical information and records.[11] Thus

---

State believes that an employee, due to illness or injury, is unable to perform his/her normal work duties."

10. There are other procedures that are also intrusive: for example a doctor's use of a tongue depressor to permit him to look down a patient's throat; or an instrument that permits him to

peer into a patient's ears; or a doctor's direction to a patient to partially undress.

11. *See Doe v. Attorney General of U.S.*, 941 F.2d 780, 795–96 (9th Cir.1991) (holding that individual has privacy interest in medical information, including diagnosis); *see also U.S. v. Westinghouse Elec. Corp.*, 638 F.2d 570, 577 (3rd Cir. 1980) ("There can be no question that an em-

in addition to implicating the Fourth Amendment, forcing employees to submit to a medical examination would implicate their rights under the Due Process Clause because such an examination would inevitably reveal private medical information. We do not believe, however, that it would make sense to divide medical examinations into two categories—those that implicate the Fourth Amendment and those that implicate the Due Process Clause of the Fifth or Fourteenth Amendment—or to examine such intrusions under two different approaches. Because various types of medical tests and examinations have already been classified as implicating the Fourth Amendment, we believe that all such tests and examinations should be analyzed under the rubric of that Amendment.[12]

■ Accordingly we conclude that Yin does have a legitimate expectation of privacy in being free from an unwanted medical examination, whether or not that examination entails any particularly intrusive procedures.[13] Thus we determine that the Fourth Amendment is implicated here.

### Yin's Expectation of Privacy

■ Although Yin has a societally-recognized expectation of privacy in not being subjected to a medical examination, several factors diminish—but do not extinguish—that expectation. We consider those factors in turn: Yin's status as an employee; a state statute permitting testing of civil service employees; a union contract incorporating the statute; and Yin's record of extended and egregious absenteeism.

■ Like any employee, Yin has a somewhat reduced expectation of privacy in the workplace, *O'Connor v. Ortega*, 480 U.S. at 709, 107 S.Ct. at 1492, as well as vis-a-vis her employer, *id.* at 717, 107 S.Ct. at 1497 ("The employee's expectation of privacy must be assessed in the context of the employment relation."). *See also Vernonia*, —— U.S. at ——, 115 S.Ct. at 2391 ("[T]he legitimacy of certain privacy expectations vis-a-vis the State may depend upon the individual's legal relationship with the State.").

■ More important in this case is a California statute that explicitly authorizes medical examinations of state civil service employees such as Yin. That statute serves to put Yin on notice that she can be subjected to an independent medical examination, at least under some circumstances,[14] and diminishes her expectations of privacy accordingly. Although there is little direct case law on point, obviously there are limitations on the state's ability to erode reasonable expectations of privacy by statutory enactments. Otherwise, Congress and state legislatures could eliminate basic Fourth Amendment protections and effectively amend the Constitution in the process by enacting statutes authorizing particular searches or seizures. For example, Congress could not eviscerate the right of the people to be secure in their homes by passing a law permitting federal agents to enter houses at will, without a warrant or probable cause.

This case, however, does not require us to draw a dividing line between lawful statutes that permissibly diminish legitimate expectations of privacy and unconstitutional statutes that impermissibly do so. We note that al-

---

ployee's medical records, which may contain intimate facts of a personal nature, are well within the ambit of materials entitled to privacy protection.").

In *Whalen v. Roe*, 429 U.S. 589, 604 n. 32, 97 S.Ct. 869, 878 n. 32, 51 L.Ed.2d 64 (1977), the Court relied on the Due Process Clause of the Fourteenth Amendment, in finding a privacy interest in medical records and specifically concluded that the privacy right in that case was not protected under the Fourth Amendment. *Whalen*, however, involved a constitutional challenge to a state law requiring physicians to report the name, address and age of every patient to whom they prescribe a narrow group of drugs with both

legal and illegal uses, not an actual examination of the person himself.

12. We do not, however, foreclose the possibility that in particular circumstances, a due process inquiry may be appropriate as well.

13. *See* n. 8 *supra*.

14. *Cal. Government Code* § 19253.5 (West 1995) provides: "(a) In accordance with board rule, the appointing power may require an employee to submit to a medical examination by a physician or physicians designated by the appointing power to evaluate the capacity of the employee to perform the work of his or her position."

872

though the California statute has been on the books for nearly 40 years and is invoked regularly,[15] it has not been the subject of a Fourth Amendment challenge in any reported case. The state, acting here in its role as an employer, is not asserting a new or singular prerogative. It is simply exercising a prerogative that has been traditionally accorded to private employers and that those employers have neither permitted to fall into desuetude nor have progressively abandoned.[16] In short, the state is simply acting like a typical employer, and the expectations of its employees are, in this case at least, no different from those of private employees. Finally, there is no suggestion that the state enacted the statute in question in an effort to undermine the Fourth Amendment.

■■■■■ The collective bargaining agreement covering state employees such as Yin also provides for independent medical examinations "[w]henever the State believes that an employee, due to illness or injury, is unable to perform his/her normal work duties."[17] It is clear that a contract may under appropriate circumstances diminish (if not extinguish) legitimate expectations of privacy.[18] While Yin was not actually a signatory to the collective bargaining agreement, the agreement nonetheless lessens her privacy expectation because it was negotiated by the union on behalf of all employees, including Yin, and represents the contractual agreement governing their working conditions.[19]

■■■■■ Finally, Yin's own experiences at the work-site have led to a diminution in her legitimate expectation of privacy. Not only has she missed an inordinate number of days due to illness, she has also experienced repeated episodes of on-the-job illness. She has suffered from fainting spells and other ailments, requiring her to place her head down on her desk or to go home early. On one occasion, she was even transported by ambulance from work to the hospital. The status of Yin's health, normally a matter that is primarily or solely of private concern, has been converted into an issue of legitimate concern for her supervisors, because it bears closely on her ability to perform her job.

We conclude that the state civil service statute, the union contract, Yin's status as an employee, and her unfortunate attendance record taken together have sharply reduced Yin's legitimate expectation of privacy vis-a-vis her employer.[20]

15. According to the state, 10 employees in the Employment Development Department, the department in which Yin worked, were required to submit to an independent medical examination in 1993 alone.

16. *See, e.g.,* William J. Hollway and Michael J. Leech, *Employment Termination: Rights and Remedies* 441 (2d ed.1993) (noting that testing of employees has been relatively common at least *since the 1940s*).

17. The contract between the state and Yin's Union provides in § 9.7 for Independent Medical Examinations as follows:
 "a. Whenever the State believes that an employee, due to illness or injury, is unable to perform his/her normal work duties, the State may require the employee to submit to an independent medical examination at State expense. The medical examination will be separate of any medical services provided under the State's Worker's Compensation program.
 b. The purpose of such independent medical evaluation is not to determine the degree of disability the employee has suffered, but rather as to whether illness or injuries sustained restrict the employee from performing the full range of his/her normal work assignment.

 c. If the State, after the independent medical examination, determines that the employee cannot perform his/her normal work assignments, the State shall give the employee the opportunity to challenge the State's medical evaluation by supplying his/her personal medical evaluations to dispute the State's findings."

18. *See Zap v. United States,* 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946) (contractor agreeing to allow government inspection of his books in order to get a government contract lost a claim to privacy that he would otherwise possess); *First Alabama Bank of Montgomery, N.A. v. Donovan,* 692 F.2d 714 (11th Cir.1982) (rejecting application of Fourth Amendment standards to bank that contracted to allow the government to perform compliance reviews).

19. The state does not argue that Yin has consented to *this* medical search just because her union has agreed in general that *some* medical searches may be appropriate. Accordingly, we do not consider whether Yin can be said to have consented to this search.

20. The state assured Yin that her medical records would be held in strictest confidence, as required

*The Government's Interests*

 To determine the constitutionality of the search at issue, we must balance the government's interest in requiring Yin to submit to a medical examination against Yin's diminished expectation of privacy. The government must not only have a legitimate interest, the search or seizure at issue must further that interest. As the Court said in *Vernonia*, application of the balancing test requires not only considering the degree of intrusiveness and the state's interests in requiring that intrusion, but also "the efficacy of this [the state's] means for meeting" its needs. *Vernonia*, — U.S. at —, 115 S.Ct. at 2394.

 In this case, the government claims it has two distinct reasons for requiring Yin to submit to a medical examination: (1) its interest in guaranteeing a stable, reliable and productive work force; and (2) its interest in ensuring public safety as well as Yin's safety.

The government clearly has a valid concern with the productivity and stability of its work force. Citizens rightly expect the government to operate as effectively and efficiently as it can, given the diverse tasks with which it is charged. The government cannot operate with any degree of efficiency if its employees miss work as frequently as Yin has. Regular performance of her work is a prerequisite for Yin's job, and for most if not all full-time governmental jobs. *Cf. Von Raab*, 489 U.S. at 670, 109 S.Ct. at 1393 (government has legitimate interest in ensuring front-line customs employees are "physically fit").

As a result of Yin's excessive absenteeism, not only has her own productivity dropped dramatically, but the productivity and morale of the office as a whole has declined. When Yin misses work because of unscheduled absences, other workers are forced to rearrange their schedules to complete pressing tasks for her. Thus, Yin's supervisors have valid cause for concern.

Given her sporadic attendance record, Yin's supervisors clearly had good reason to question her ability to perform her duties. Yin's supervisors requested that Yin undergo an independent medical examination only after she refused to provide them with a copy of her medical records. By asking Yin to submit to such a test, Yin's supervisors were seeking otherwise unavailable information that would help them determine whether Yin would be able to do her job properly. Under the circumstances, requiring Yin to undergo an independent medical examination would clearly further the state's interest in assuring a productive and stable work force. Accordingly, we conclude that the search at issue in this case serves a substantial and weighty government interest.[21]

Balancing Yin's diminished expectations of privacy against the state's interest in maintaining a productive and stable work force, we conclude that the state's request that Yin submit to an independent medical examination is reasonable and therefore constitutional.

*Conclusion*

The district court's opinion is

AFFIRMED.

O'SCANNLAIN, Circuit Judge, specially concurring:

I certainly agree that the State did not violate Yin's Fourth Amendment rights by requiring her to undergo an independent medical examination. I would raise a flag of caution, however, about the court's expansive statement that *all* medical examinations im-

---

by state policy, with access limited to the department's Medical Director. Yin did not challenge that assurance.

21. The state also argues that it was concerned about Yin's ability to drive safely because of her alleged bouts of dizziness and was therefore acting to preserve public safety as well as Yin's welfare. Because we conclude that the state's interest in assuring a productive work force is sufficient to justify requiring Yin to take a medi-

cal exam, we do not need to reach the merits of the state's second asserted interest. We note, however, that we have serious questions whether the state's second reason is sufficient to support a reasonableness finding. There is no evidence in the record that Yin ever had an accident, whether while driving for the state or otherwise. Moreover, unlike in cases such as *Skinner*, while Yin at times drives for the government, she does not drive anyone but herself.

plicate the Fourth Amendment, whether or not the examination entails any particularly intrusive procedures.

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend IV. Before we apply the reasonableness standard, the event at issue must constitute a "search" or a "seizure." The Supreme Court unquestionably has deemed certain "medical" procedures searches. A "compelled intrusio[n] into the body for blood" is a search. *Schmerber v. California*, 384 U.S. 757, 767–68, 86 S.Ct. 1826, 1833–35, 16 L.Ed.2d 908 (1966). A breathalyzer test, "which generally requires the production of alveolar or 'deep lung' breath for chemical analysis," is a search. *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 616–17, 109 S.Ct. 1402, 1412–13, 103 L.Ed.2d 639 (1989) (citation omitted). The collection and testing of urine, which "intrudes upon expectations of privacy that society has long recognized as reasonable," is also a search. *Id.* at 617, 109 S.Ct. at 1413; *see Vernonia Sch. Dist. 47J v. Acton*, —— U.S. ——, ——, 115 S.Ct. 2386, 2390, 132 L.Ed.2d 564 (1995).

It would be utterly unsound to make the bold extrapolation from these cases that all medical examinations are searches. First, it is unclear exactly what qualifies as a "medical examination." Second, the reason certain medical procedures constitute searches is that they "intrud[e] upon expectations of privacy" that society recognizes as reasonable. *Skinner*, 489 U.S. at 617, 109 S.Ct. at 1413. Under the court's newly fashioned rule, however, if any encounter can be labeled a medical examination, it per se is a search, "whether or not that examination entails any particularly intrusive procedures." The per se rule puts the cart before the horse. We should be cautious to outpace medical technology in this sensitive area of the law.

Since I do agree, however, that certain aspects of the routine physical examination at issue here would implicate the requisite "concerns about bodily integrity," *id.* at 617, 109 S.Ct. at 1413, I concur in the court's application of the balancing test for reasonableness, and in the result in this case. I cannot, however, concur in its dictum.