191 P.3d 205

**Jonathan CANTWELL, Plaintiff–Appellant,**

**v.**

**The CITY OF BOISE, John Walhof, Richard Dees and William Nary, Defendants–Respondents.**

**No. 34283.**

Supreme Court of Idaho, Boise, June 2008 Term.

July 17, 2008.

Michael B. Schwarzkopf, Boise, for appellant.

Boise City Attorney's Office, Boise, for respondent. Scott B. Muir argued.

J. JONES, Justice.

Jonathan Cantwell brought suit against the City of Boise, claiming he was wrongfully terminated from his employment in the City's Public Works Department. His suit included claims against several fellow employees. The City moved for summary judgment on all claims and the district court granted the same. Cantwell appealed.

## I.

### FACTUAL AND PROCEDURAL BACKGROUND

Jonathan Cantwell commenced employment with the City of Boise as a maintenance worker in the Public Works Department

around February 1, 1994. On February 3, 1994, he acknowledged (1) receipt of a copy of the Boise City Employee Policy Handbook and (2) an understanding that the policies, rules and standards contained therein would be used to govern his employment with the City. On February 13, 2003, Cantwell acknowledged receipt of certain policy changes by the City, including revisions to its Harassment Policy, Due Process Procedure, and Problem Solving Procedure. Cantwell claims these documents constituted a binding employment contract between himself and the City.

On March 30, 2004, Larry Bryant, Cantwell's manager, informed Rich Dees, the Public Works Operations Manager, that Cantwell had acted inappropriately toward a coworker, Belinda Trapasso, the previous day. According to Bryant, Cantwell "cussed profusely" at Trapasso in response to her request that he complete his timesheet. Bryant then prepared a written reprimand and sent it to Dees for review. Dees apparently noticed the word "violence" in the reprimand and contacted Bryant for further explanation. Dees also contacted some of Cantwell's coworkers to question them about his recent behavior. Dees was concerned about what he heard and therefore contacted the Human Resources Division Manager, John Walhof. Walhof instructed the HR Advisor, Sarah Martin, to assemble a workplace violence assessment team to conduct an investigation. The City placed Cantwell on administrative leave while the assessment team conducted an investigation into his workplace behavior. At this time, Dees spoke with Cantwell, reminded him about the counseling services offered by the City's Employee Assistance Program (EAP), and strongly encouraged him to utilize those services.

Following his placement on leave, Dees and Martin interviewed four of Cantwell's coworkers, his supervisor, and an additional plant employee. They first interviewed Trapasso, who stated that Cantwell blew up when asked repeatedly to complete his timesheet. Trapasso indicated she had never witnessed violent behavior by Cantwell, other than yelling, and noted that his behavior had

been escalating since his father died in December. In a written statement, another coworker present at the scene, Steve Lawler, described the exchange in more detail. Lawler claimed the conversation was a "one-way rant session that lasted several minutes."

Other coworkers detailed additional incidents. Ron Birkenbine told interviewers that Cantwell "has threatened people both inside and outside the City.... His threats are very abrasive. He describes how he will shoot someone and then watch the blood spill out of their body." Birkenbine also claimed to have heard Cantwell say he was going to blow up City Hall. Birkenbine described an incident where he complained to Bryant because Cantwell refused to do a job. According to Birkenbine, Bryant said to let it go, and someone else had to do the job. Bryant stated that if Cantwell could control his temper he would be a good employee, but he did not know whether that would be possible.

Dees and Martin interviewed Cantwell on April 7. Cantwell had not yet contacted the EAP, but told them he planned to make an appointment later that day. Regarding the March 29 incident, Cantwell recalled getting "pretty bent out of shape" about the timesheet situation, but he did not recall saying anything threatening. Cantwell stated, "I'm not going to say I didn't, but I don't remember saying anything." He denied making a comment about blowing up City Hall. When asked if he ever stated he was "going to come to work and [annihilate] everyone," Cantwell claimed he "would never say [he was] going to do anything." Rather, he would have said, "I wish, or it wouldn't be bad if somebody did, or if this happened I wouldn't lose any sleep." He continued, "Obviously this type of behavior, shooting people, doesn't prove anything, and only gets you dead or in prison and I have no intention what-so-ever of going there." Cantwell did not recall ever seriously telling anyone he would not do a work assignment. He further stated that Bryant had never counseled him regarding his behavior.

Cantwell concluded by stating he was not upset with any particular individuals, but by the whole situation, including his personal

life. Cantwell explained that his father had passed away six months ago, and that he had to care for his mother every day. This had been a great frustration, but the situation was improving. Cantwell did feel his coworkers were avoiding him in the past few months, and that it was "understandable given his emotional state." He was surprised when asked if he knew his coworkers were concerned with his potential for violent behavior. Cantwell further stated he had no hard feelings toward his coworkers for reporting this and that he understood why people were tired of it. Finally, when asked what he thought should happen, Cantwell said he should go to counseling, and would like the chance to clean up his act. He further said if he doesn't straighten up, he should be sent down the road, but that he would like to give it a shot.

On April 19, 2004, the City terminated Cantwell's employment based on the results of its investigation into his workplace conduct. Cantwell timely appealed his termination, requesting a grievance hearing, which was held before a hearing officer on May 25, 2004. In his findings of fact, the hearing officer noted "no evidence was introduced showing that Cantwell's job performance was unsatisfactory during this time and no disciplinary action was taken against Cantwell by the City as a result of his complaints." The hearing officer noted that, while some coworkers were concerned about Cantwell's talk of violence, others did not take his statements seriously. He specifically stated that Cantwell's supervisor did not take them seriously, considering the fact he took no action with regard to them, did not report them to anyone until the timesheet incident, and did not consider any of Cantwell's statements to constitute a direct threat to City employees. Based on these findings, the hearing officer concluded that Cantwell violated the City's general workplace harassment policy in connection with the Trapasso incident, but that termination was "unduly harsh." Nevertheless, he found the nature of the Trapasso incident to justify disciplinary action beyond a written reprimand, and ultimately concluded Cantwell should be suspended for 30 days and that he must offer sincere oral and written apologies prior to reinstatement.

As to the threat of violence, the hearing officer determined that Cantwell's alleged statements were more appropriately analyzed under the City's Workplace Violence Policy. On this front, the hearing officer noted the City failed to follow its own policy in that it failed to report or to address any of the alleged danger signals presented by Cantwell's statements and because the City's workplace violence assessment team was not properly constituted, changed over time, and did not include an EAP representative. Thus, the hearing officer concluded the City could not terminate Cantwell as a result of his violation of the Workplace Violence Policy. In reaching this conclusion, the hearing officer penned a paragraph, the interpretation of which is the crux of both parties' claims on appeal, and which provided the basis for the City's imposition of additional conditions for Cantwell's reinstatement. This paragraph states:

> The Hearing Officer is mindful that by overturning Cantwell's dismissal, a potentially dangerous individual might be returned to the workplace. However, the Hearing Officer must decide the case he is presented with. Also, it is equally plausible that a properly constituted WVAT, one including an EAP team member, might devise a different intervention plan for Cantwell or recommend disciplinary action short of dismissal. Also, this Decision does *not* prohibit the City from pursuing disciplinary action against Cantwell for allegedly violating the workplace violence policy. The City has a right to proceed against Cantwell if it so chooses, in accordance with this Decision. If the City follows its workplace violence policy, and afterwards decides to discipline Cantwell for any violation of it, Cantwell has a right, if he so chooses, to subsequently contest that action pursuant to the City's due process procedures.

Following the hearing officer's decision, the City prepared a letter outlining certain requirements Cantwell would have to satisfy in order to return to work following his 30–day suspension (hereinafter the 6/17 Memo). In the 6/17 Memo, the City confirmed that it would reinstate Cantwell pursuant to the

hearing officer's decision, and warned Cantwell it would not tolerate further inappropriate behaviors or retaliation of any kind. The City listed seven additional requirements for returning to work. They included a requirement that Cantwell undergo a fitness-for-duty evaluation by a specified doctor at the City's expense. This doctor would have to recommend that Cantwell was fit to return to the job. In addition, the City required Cantwell to cooperate with any follow-up appointments at his own expense to the extent they would not be covered by insurance. Accordingly, Cantwell had to sign a release to allow release of relevant information to City management regarding his compliance with the conditions. Finally, Cantwell would be required to submit a written plan describing how he planned to achieve and sustain an acceptable level of performance relative to his behavior at work, and prepare a written apology to his coworkers. Cantwell was required to comply with all terms of the 6/17 Memo in order to continue his employment with the City. The 6/17 Memo further provided that "[t]hese requirements are not grievable under the City's Due Process or Problem Solving Procedures."

Cantwell, along with his union representative, met with the City and agreed to these terms. At this meeting, Cantwell stated he had no problem going for a fitness-for-duty examination, and that he looked forward to seeing the results. Cantwell executed the 6/17 Memo, indicating he agreed to the conditions. Cantwell gave the City no indication at the meeting that he had any problem with the requirements. Nevertheless, on June 28 the City received a fax from Andrew Hanhardt, Cantwell's union representative, claiming the City lacked authority to enforce the terms of the 6/17 Memo and declaring it "null and void." Cantwell failed to appear for the scheduled examination. The June 28 fax also indicated that Cantwell intended to initiate the City's Problem Solving Process in regard to the return-to-work requirements. In response, the City sent a letter reaffirming its position that, pursuant to the 6/17 Memo, the requirements for Cantwell's return to work were not grievable. The City also stated its intention was merely to ensure Cantwell was fit to return to the workplace for the benefit of the City's employees, the taxpayers, and Cantwell himself. It continued, "If you are unable to return to work pursuant to the conditions in the [6/17 Memo], the City of Boise will consider your action to be job abandonment and insubordination and will take disciplinary action up to and including dismissal."

The City terminated Cantwell's employment on July 19, 2004. Prior to this action, a number of things happened. Michael Schwarzkopf, Cantwell's attorney, sent a letter to the City suggesting it was attempting to circumvent the hearing officer's decision and retaliating against Cantwell. In response to this letter, the City met with Schwarzkopf and Cantwell a number of times in attempt to resolve the issue. After two unsuccessful meetings, the City determined Cantwell was unwilling to comply with the conditions. Thus, it terminated Cantwell's employment effective July 19, 2004. The letter terminating his employment also informed Cantwell of his right to initiate the Due Process Procedure if he did not agree with its decision.

Cantwell timely appealed his second termination, and requested another grievance hearing. The same hearing officer heard his appeal, and ultimately upheld the City's termination. The hearing officer considered whether the City met its burden of "good cause" for terminating Cantwell pursuant to its Due Process Procedure. The hearing officer found the return-to-work conditions imposed by the City were not punitive, but rather required by the City as a good faith attempt to insure Cantwell was psychologically able to return to work. He also noted that the City's Due Process Procedure expressly provided that it was not intended to modify the existing management rights of the City. Thus, the hearing officer determined the City had authority to impose the conditions contained in the 6/17 Memo. In addition, the hearing officer found the requirements the City imposed were reasonable, and that Cantwell did not have proper justification to refuse to comply with them. For these reasons, the hearing officer found Cantwell was guilty of insubordination when he refused to comply with the conditions and

that the City had good cause to terminate his employment.

Over a year later, Cantwell filed a civil complaint in district court against the City of Boise, and City employees John Walhof, Richard Dees, and William Nary. In his complaint, Cantwell alleged that the City breached the employment contract, including its covenant of good faith and fair dealing, by imposing additional conditions upon Cantwell's reinstatement from his first termination, by refusing to allow Cantwell to object to these conditions through the Due Process Procedure, and by terminating Cantwell a second time for refusing to comply with the additional conditions. Cantwell claimed the City terminated his employment in retaliation for using the Due Process and Problem Solving Procedures with regard to the first termination, thus violating public policy. Cantwell alleged violations of procedural and substantive due process, claiming the City violated his due process rights when it refused to allow him to object to the additional conditions using the Due Process and Problem Solving Procedures, which resulted in his second termination. Cantwell alleged that Walhof, Nary, and Dees tortiously interfered with his employment contract by these same actions, and that they tortiously interfered with his prospective economic advantage for future employment.

The City filed a motion for summary judgment on all claims, which the district court granted. Cantwell appeals "the totality" of the district court's decision.

## II.

## DISCUSSION

In this case, we consider whether the district court erred when it struck portions of an affidavit submitted on Cantwell's behalf; whether the district court erred when it granted summary judgment with regard to Cantwell's various claims; and whether either party is entitled to attorney fees.

## A.

## Standard of Review

When a party appeals a district court's grant of summary judgment, this Court applies the same standard the district court used when it ruled on the motion. *Carnell v. Barker Mgmt., Inc.*, 137 Idaho 322, 326, 48 P.3d 651, 655 (2002). Summary judgment is proper "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Idaho R. Civ. P. 56(c). The Court construes all disputed facts in favor of the nonmoving party, and draws all reasonable inferences it can draw from the record in favor of the nonmoving party. *Carnell*, 137 Idaho at 327, 48 P.3d at 656. While this Court will draw reasonable inferences in favor of the non-moving party, the non-moving party cannot rest upon mere speculation. *Finholt v. Cresto*, 143 Idaho 894, 896–97, 155 P.3d 695, 697–98 (2007). The nonmoving party must submit more than just conclusory assertions that an issue of material fact exists to withstand summary judgment. *Id.* A mere scintilla of evidence or only slight doubt as to the facts is not sufficient to create a genuine issue of material fact. *Id.* Summary judgment is appropriate where the nonmoving party bearing the burden of proof fails to make a showing sufficient to establish the existence of an element essential to the party's case.[1] *Carnell*, 137 Idaho at 327, 48 P.3d at 656.

## B.

## The Trial Court Did Not Abuse its Discretion By Striking Portions of the Affidavit

Cantwell argues the trial court erred when it struck paragraph 12 and exhibits 3 and 4 from the affidavit of Cantwell's union representative, Andrew Hanhardt. When reviewing the trial court's evidentiary rulings, this Court applies an abuse of discre-

---

1. Although Cantwell bases his appeal on an assertion that material issues of fact exist that preclude summary judgment, we fail to find any such issues of fact. Rather, the issues raised by Cantwell all appear to be questions of law, largely unsupported by citation to the record or to legal authority.

tion standard. An abuse of discretion review requires a three-part inquiry: (1) whether the lower court rightly perceived the issue as one of discretion; (2) whether the court acted within the boundaries of such discretion and consistently with any legal standards applicable to specific choices; and (3) whether the court reached its decision by an exercise of reason. *McDaniel v. Inland Northwest Renal Care Group–Idaho, LLC,* 144 Idaho 219, 221–22, 159 P.3d 856, 858–59 (2007). The appellant has the burden of showing that the district court abused its discretion. *W. Cmty. Ins. Co. v. Kickers, Inc.,* 137 Idaho 305, 306, 48 P.3d 634, 635 (2002).

The district court struck paragraph 12 because it was based on conjecture and exhibits 3 and 4 because they lacked foundation. In paragraph 12, Hanhardt affies that he learned the City intended to rely on a newly revised Due Process Procedure during Cantwell's second termination hearing. He then affies the City did in fact rely on the new procedure during the second hearing. Following this, he describes the changes made to the policies, and attaches the revised policies as exhibits 3 and 4 to his affidavit. On appeal, Cantwell argues, without citing any authority, that the stricken testimony and exhibits were admissible based on Hanhardt's personal knowledge. He further asserts that he established proper foundation for admission of the documents because Hanhardt testified he was involved in preparing for Cantwell's second termination hearing. He relies on the opposing party's affidavits for further foundation. Cantwell has not met his burden of proving the trial court abused

its discretion. Cantwell does not cite even one rule of evidence to support his claim that the documents were admissible notwithstanding the district court's decision to the contrary. Since Cantwell failed to demonstrate how the judge allegedly abused his discretion, we decline to find he did so.

## C.

### The City Did Not Breach Any Contractual Agreement Between Itself and Cantwell

 Cantwell bases his breach of contract claim upon the City's imposition of additional conditions for his return to work, and its subsequent termination of his employment for refusing to comply with these conditions. Although it is slightly unclear, Cantwell appears to argue that the City breached a number of alleged contractual obligations, including the provisions of the Policy Handbook and the Due Process and Problem Solving Procedures.[2] Cantwell claims the hearing officer's first decision foreclosed the City from imposing additional conditions (not imposed by the hearing officer himself) upon Cantwell's return to work. As to the breach of the Due Process Procedure, Cantwell claims the imposed conditions were punitive, and therefore not within the realm of the City's contractually-retained management rights.[3] The district court granted summary judgment against Cantwell on his breach of contract claims, finding that "neither the contract nor the decision of the Hearing Officer state that the City would be precluded from imposing non-punitive conditions on the

---

**2.** Cantwell did not include the Policy Handbook in the record. However, the City attached copies of the applicable policies, including the Workplace Violence Policy, the Due Process Procedure, and the Problem Solving Procedure, to its affidavit in support of summary judgment. It is also worth note that Cantwell most likely failed to rebut the presumption that his employment was at-will. He merely argues that this Court has considered an employment manual to create a contract of employment in some cases, but does not attach any applicable provisions from the manual, either here or below. However, the City conceded, for the purposes of summary judgment only, that Cantwell was not an at-will employee, so we nevertheless address his arguments as if he had properly rebutted the at-will presumption.

**3.** Cantwell also alleges the City terminated him in violation of public policy. "In Idaho, the only general exception to the employment at-will doctrine is that an employer may be liable for wrongful discharge when the motivation for discharge contravenes public policy." *Edmondson v. Shearer Lumber Prods.,* 139 Idaho 172, 176, 75 P.3d 733, 737 (2003). In this case, Cantwell does not allege he was an at-will employee, but alleges the City breached his contract of employment. Since the public policy exception applies only to at-will employees, and Cantwell and the City agreed for the sake of the summary judgment motion that Cantwell's employment was not at-will, Cantwell cannot prevail on this claim.

Plaintiff's ability to return to work." We agree.

While the hearing officer found in his first decision that the City did not follow the Workplace Violence Policy, the hearing officer specifically found that, "[T]his Decision does not prohibit the City from pursuing disciplinary action against Cantwell for allegedly violating the workplace violence policy. The City has a right to proceed against Cantwell if it so chooses, in accordance with this Decision." Thus, the hearing officer's decision required the City to allow Cantwell to return to work, but nowhere denied the City the right to impose conditions reasonably necessary to ensure Cantwell did not pose a threat to his coworkers or to the City. In addition, the Due Process Procedure expressly states that it does not modify or circumscribe any management rights of the City. As the district court noted, the alleged contractual documents contained no restriction on the City's ability to ensure the psychological fitness of its employees. To the contrary, the City expressly retained the right to make employment decisions in order to maintain efficiency and to demote or dismiss employees for proper cause, and the hearing officer expressly stated the City could pursue disciplinary action against Cantwell "if it so chooses."

The City chose to impose additional conditions to ensure Cantwell posed no threat in the workplace. The City imposed conditions that were not at odds with the hearing officer's initial decision. These conditions were reasonable in light of the threats Cantwell reportedly made prior to the first proceeding. The conditions were not disciplinary in nature, but reasonable measures to ensure a safe workplace. Indeed, Cantwell's final termination was not for making the remarks, but for failure to comply with these reasonable requests by his employer.[4] The City did not breach its contract with Cantwell when it imposed reasonable conditions upon his return to work, or when it terminated his employment for failure to comply with the conditions.

### D.

## Cantwell Has No Claim for Violation of the Covenant of Good Faith and Fair Dealing

■ Cantwell argues the trial court erred when it held that the City imposed the extra conditions in good faith. According to Cantwell, these conditions and his second termination violated, qualified, or significantly impaired his contract rights, as represented by the Due Process Procedure, Workplace Violence Policy, and the first decision of the Hearing Officer. He points to a number of actions taken by the City, which he claims call into question the City's good faith and fair dealing, including "the animosity they demonstrated toward the hearing officer," as well as toward the policies and procedures that existed at the time of Cantwell's first termination. The only non-stricken evidence Cantwell presents in support of this claim is his description of a conversation between Nary and Hanhardt in which Nary "loudly and angrily" told Hanhardt he was going to make sure a decision like the hearing officer's first decision never happened again.

■ Idaho law recognizes a cause of action for breach of an implied covenant of good faith and fair dealing. *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 242, 108 P.3d 380, 389 (2005). Such a covenant is found in all employment agreements, including employment at-will relationships. *Id.* at 242–43, 108 P.3d at 389–90. The covenant requires the parties to perform, in good faith, the obligations required by their agreement. *Fox v. Mountain W. Elec.*, 137 Idaho 703, 710–11, 52 P.3d 848, 855–56 (2002). An action by one party that violates, qualifies or significantly impairs any benefit or right of the other party under an employment con-

---

4. As a side note, Cantwell expressly agreed to these conditions in the June 17 Memorandum. Cantwell presents no reason why this document does not form part of the employment contract. Nor does he provide any grounds for avoiding this agreement, such as duress, fraud, or lack of consideration. As such, there is no reason to find that Cantwell was not bound to comply with the terms of this agreement. The City expressly stated that refusal to comply with the conditions could result in termination, and acted in accordance with this agreement when it terminated Cantwell the second time.

tract, whether express or implied, violates the covenant. *Jenkins,* 141 Idaho at 243, 108 P.3d at 390. In the present case, Cantwell received the benefits and rights granted to him under his contract. Since the City did not impair any rights or benefits provided to Cantwell under the contract, Cantwell has no claim for breach of the covenant of good faith and fair dealing. The covenant does not provide additional rights unavailable under the negotiated contract.

## E.

### The City Did Not Violate Cantwell's Procedural or Substantive Due Process Rights

#### i.

##### Procedural Due Process

■ Cantwell claims the City violated his procedural due process rights because it claimed the imposition of the return-to-work conditions was not grievable under its Problem Solving Procedure. He also seems to argue the procedures actually employed by the City were not adequate because the reasons it provided for his termination were pretextual, relying on this Court's opinion in *Lubcke v. Boise City/Ada County Housing Authority,* 124 Idaho 450, 460, 860 P.2d 653, 663 (1993).

■ When a state has conferred a property interest in employment, the Due Process Clause prevents the deprivation of such an interest without appropriate procedural safeguards, including notice and an opportunity to be heard. *Anderson v. Spalding,* 137 Idaho 509, 516, 50 P.3d 1004, 1011 (2002) (citing *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494, 503–04 (1985)). Due process requires that, prior to termination, an employee must be given (a) oral or written notice of the reason(s) for the termination, (b) an explanation of the employer's evidence, and (c) an opportunity to present his or her side of the story. Anderson, 137 Idaho at 516, 50 P.3d at 1011. There does not need to be a full-blown evidentiary hearing prior to the termination, so long as one may be had after the termination. *Id.* In the present case, Cantwell had two hearings before a hearing officer. At each hearing, he had an opportunity to present his side of the case, and the hearing officer considered his side of the story. Prior to these hearings, Cantwell received notice and an opportunity to be heard through his interviews with his employers. Thus, the City afforded Cantwell appropriate procedural safeguards.

Further, Cantwell cannot rely on *Lubcke.* In Anderson, this Court explained that "the principle underlying *Lubcke* is that giving pretextual reasons for termination may deprive a person of a meaningful opportunity to be heard." 137 Idaho at 516, 50 P.3d at 1011. Cantwell does not point to any evidence showing the City's alleged reasons for termination are any different than those reasons the hearing officer considered in his decisions. To the extent Cantwell and the City disagree with regard to the City's reasons for terminating Cantwell's employment, Cantwell had the opportunity to present his side of the story to the hearing officer. As such, his procedural due process rights were satisfied.

#### ii.

##### Substantive Due Process

■ Cantwell argues the trial court erred when it held there was no evidence from which a reasonable jury could find the City denied Cantwell's substantive due process. According to Cantwell, the City denied him substantive due process when it forced him to choose between his privacy rights and compliance with the City's return-to-work conditions. "Because [the conditions] shock the conscience and demonstrate no attempt at balancing Appellant's privacy rights with the city's asserted desire to assure itself of Appellant's self-control, conditioning his continued employment on agreement with them is a violation of Appellant's constitutional right to privacy and, thus, a violation of substantive due process."

The City disagrees, arguing Cantwell's contention here "simply does not rise to the high level of conscience shocking behavior that the legal history of this claim demonstrates is required." The City further looks

to *Yin v. State of California*, 95 F.3d 864 (9th Cir.1996), to argue that "[t]he balancing of interests in this matter supports the trial court's conclusion that requiring Cantwell to undergo a fit for duty examination was neither a violation of his right to privacy nor conscience shocking."

██ A substantive due process claim "protects individual liberty against certain governmental actions regardless of the fairness of the procedures used to implement them." Anderson, 137 Idaho at 517, 50 P.3d at 1012 (quoting *Collins v. City of Harker Heights, Texas*, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261, 273 (1992); *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 665–66, 88 L.Ed.2d 662, 668 (1986)). Both parties address the applicability of *Yin*, where the Ninth Circuit considered whether the state of California could compel an employee with a prolonged and egregious history of absenteeism and a record of on-the-job illnesses to undergo a fitness-for-duty medical examination. 95 F.3d at 866. In that case, the Ninth Circuit announced it would analyze Fifth Amendment claims in the employment context under the same rubric it uses to address Fourth Amendment claims:

> [I]n addition to implicating the Fourth Amendment, forcing employees to submit to a medical examination would implicate their rights under the Due Process Clause because such an examination would inevitably reveal private medical information. We do not believe, however, that it would make sense to divide medical examinations into two categories—those that implicate the Fourth Amendment and those that implicate the Due Process Clause of the Fifth or Fourteenth Amendment—or to examine such intrusions under two different approaches. Because various types of medical tests and examinations have already been classified as implicating the Fourth Amendment, we believe that all such tests and examinations should be analyzed under the rubric of that Amendment.

*Id.* at 870–871.

The Ninth Circuit noted that medical examinations and medical tests not conducted as part of a criminal investigation are gener-

ally subject to a balancing test, not the warrant/probable cause requirement. *Yin*, 95 F.3d at 869. Under the balancing test, the court determines if a search is reasonable by weighing the privacy interests of the individual against the government's interest in the search. *Id.* at 870. The *Yin* court noted that an employee has a somewhat diminished expectation of privacy in the workplace, and that courts must examine an employee's expectation of privacy in the context of the employment relationship. *Id.* at 871. Given the overall context of Cantwell's employment relationship with the City, the City's request was not highly intrusive, and the City had a significant interest in requiring that Cantwell be psychologically fit to return to work. Cantwell expressly agreed to these conditions, in the presence of the City's representatives and his union representative, but, even if he had not, the City still had the right to impose reasonable return-to-work conditions in order to address legitimate concerns regarding workplace safety.

Given the foregoing, we cannot say the City infringed upon Cantwell's substantive due process rights. Given Cantwell's history, we cannot say it was unreasonable to require Cantwell to undergo evaluation and to disclose certain medical information to ensure his fitness to return to work.

## F.

### Cantwell Cannot Establish A Claim for Tortious Interference

██ Cantwell claims the extra conditions significantly impaired his prospective ability to enforce his right to maintain employment with the City because it forced him to forego his right to address the extra conditions without putting his job on the line. He claims the trial court erred when it held there was no evidence from which a reasonable jury could find the City terminated him by improper means or with improper purpose. The City argues Cantwell's assertion that the City imposed these conditions for any improper reason is pure speculation, unsupported by the record.

██ To establish a claim for intentional interference with a prospective economic

advantage, Cantwell must show (1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted. *Highland Enter., Inc. v. Barker*, 133 Idaho 330, 338, 986 P.2d 996, 1004 (1999). The trial court granted summary judgment on this claim because Cantwell failed to raise a genuine issue of material fact concerning whether or not the defendants engaged in a wrongful interference. The district court did not err. In a recent case, this Court denied a claim for tortious interference with contract because the plaintiff failed to establish the alleged interferer was a third party to the contractual relationship. *See BECO Constr. Co. v. J–U–B Eng'rs*, 145 Idaho 719, 724–26, 184 P.3d 844, 849–51. The same result obtains here.[5] Cantwell does not allege the defendants here acted outside the scope of their duties as Cantwell's supervisors. The actions of an agent are the actions of the corporation. *Ostrander v. Farm Bureau Mut. Ins. Co. of Idaho*, 123 Idaho 650, 654, 851 P.2d 946, 950 (1993). An agent is only liable for actions which are outside its scope of duty to the corporation. *Id.* Since Cantwell fails to establish that the defendants acted outside the scope of their authority, he fails to show any *wrongful* interference. Since there is no third party to the relationship, Cantwell cannot state a claim for tortious interference. *See Ostrander*, 123 Idaho at 654, 851 P.2d at 950; *BECO*, 145 Idaho at 725–26, 184 P.3d at 850–51.

### G.

### Neither Party Is Entitled to Attorney Fees

The City contends the Court should award it attorney fees because Cant-

well's brief is "noticeably devoid of citations to the record and to legal authority to support the numerous legal issues he brings on appeal and he has not made any good faith argument for the extension, modification or reversal of existing law." I.C. § 12–117(1) provides:

> Unless otherwise provided by statute, in any administrative or civil judicial proceeding involving as adverse parties a state agency, a city, a county or other taxing district and a person, the court shall award the prevailing party reasonable attorney's fees, witness fees and reasonable expenses, if the court finds that the party against whom the judgment is rendered acted without a reasonable basis in fact or law.

To award attorney fees under I.C. § 12–117, the Court must not only find in favor of the party requesting fees, but it must also find that he acted without a reasonable basis in fact or law. *Canal/Norcrest/Columbus Action Comm. v. City of Boise*, 136 Idaho 666, 671, 39 P.3d 606, 611 (2001). In this case, Cantwell raised legitimate issues regarding the tension between employment rights and prevention of workplace violence and the required disclosure to an employer of personal medical information. We cannot say the action was without a reasonable basis in fact or law, and therefore decline to award attorney fees to the City.[6]

### III.

### DISPOSITION

We affirm the district court's summary judgment to the City. Costs to the City. No attorney fees.

Chief Justice EISMANN, and Justices BURDICK, W. JONES and HORTON concur.

---

5. This Court has previously noted that the torts of intentional interference with prospective economic advantage and intentional interference with contract are similar, and that cases and commentary addressing the two torts often apply interchangeably for proving the common elements. *See Highland Enter.*, 133 Idaho at 338 n. 3, 986 P.2d at 1004 n. 3.

6. Cantwell also seeks attorney fees under I.C. § 12–120(3). Since Cantwell does not prevail on any of his claims, he is not entitled to fees under this provision.