# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 40034

THE BANK OF COMMERCE, an Idaho banking corporation,

    Plaintiff-Counterdefendant-Respondent,

v.

JEFFERSON ENTERPRISES, LLC, an Idaho limited liability company,

    Defendant-Counterclaimant-Appellant.

Pocatello, May 2013 Term

2013 Opinion No. 74

Filed: June 20, 2013

Stephen W. Kenyon, Clerk

_____

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County.  Hon. Robert C. Naftz, District Judge.

The decree of foreclosure and judgment of the district court are <u>affirmed</u>.

Able Law PC, Pocatello, for appellant. A. Bruce Larson argued.

Nelson Hall Parry Tucker, P.A., Idaho Falls, for respondent. Brian T. Tucker argued.

_____

J. JONES, Justice.

The Bank of Commerce ("Bank") instituted this action to foreclose two mortgages against the Pocatello real estate development of Jefferson Enterprises, LLC ("Jefferson"). Jefferson counterclaimed on a variety of grounds. The district court granted summary judgment in favor of the Bank, ordering foreclosure of the mortgages. We affirm.

## I.
### FACTUAL AND PROCEDURAL HISTORY

In late 2005 and early 2006, Jefferson was engaged in the development of a large subdivision known as the Southern Hills Project (the "Project") in the City of Pocatello. At that time, a Jefferson entity owned an eighty acre parcel of land (the "Eighty Acre Parcel"), which was encumbered by a mortgage held by D.L. Evans Bank ("D.L. Evans"). Another Jefferson

1

entity held an option to purchase an adjacent parcel of property known as the "Wood Parcel." The option on the Wood Parcel was set to expire on May 10, 2006, and the owners were unwilling to extend it. Jefferson considered the Wood Parcel to be critical to the success of the Project and began seeking financing for its acquisition in the final days of 2005.

Jefferson, acting through its managing member Dustin Morrison, initially sought financing through D.L. Evans, which held the mortgage on the Eighty Acre Parcel. Morrison proposed a loan of $2.8 million, which D.L. Evans declined although indicating a willingness to lend $2.2 million. On April 21, 2006, Morrison approached Steve Worton, a loan officer with the Bank, seeking a loan in the amount of $2.8 million. Morrison contends he submitted an application for funding in that amount, which proposed that the Bank take a first priority mortgage on the Wood Parcel and a second priority mortgage (behind D.L. Evans) on the Eighty Acre Parcel.[1] Morrison further alleges that there was an oral "pre-commitment" of sorts—that as part of the negotiations leading up to the approval of the loan the Bank agreed to take a second position mortgage on the Eighty Acre Parcel. However, Worton testified that beginning with their first conversation, Worton and Morrison understood the Bank would have a first position interest in both parcels. In any event, on the 9th of May the Bank's Board of Trustees approved a loan in the amount of $2,223,805, on the condition that the Bank have a first position security interest on both the Eighty Acre Parcel and the Wood Parcel.

Faced with the imminent expiration of the option to purchase the Wood Parcel, Morrison contacted D.L. Evans in an attempt to negotiate a subordination of its mortgage on the Eighty Acre Parcel. D.L. Evans would not agree to subordinate. Thus, in order to place the Bank in first position per the conditions of the loan, Jefferson had to pay off the existing mortgage before it could close on the Bank's loan. The loan closed on May 10, 2006. The initial note is in the principal amount of $2,223,805, dated May 9, 2006, and secured by a mortgage recorded on May 10, 2006. The following year, Jefferson gave the Bank an additional note, representing accrued interest on the first note. The second note is in the amount of $400,000,[2] dated June 27, 2007, and secured by a mortgage recorded on June 27, 2007.

---

[1] The loan application actually consisted of Morrison's oral presentation and a "fairly thick binder" that had "tax returns, financial statements, and an appraisal of the property, projected sales and other information." The binder apparently went to the Bank's loan committee on May 8, 2006, as part of the loan package.

[2] This note was subsequently amended on February 21, 2008, to increase the loan amount by $20,062.20 and to extend the due date from January 1, 2008, to May 1, 2008.

When Jefferson defaulted on the notes, the Bank filed this action to foreclose on its mortgages. Jefferson counterclaimed on a number of grounds. The Bank subsequently moved for summary judgment. The district court issued a memorandum decision and order on January 17, 2012, dismissing Jefferson's counterclaims and ordering the foreclosure of the Bank's mortgages. That same day, the district court issued a judgment that essentially summarized what it had done in the order and required that each party pay its own attorney fees and costs. The Bank timely moved for an award of attorney fees and costs, while Jefferson moved for reconsideration. On April 19, 2012, the district court entered: decisions denying the motion to reconsider and granting the request for attorney fees and costs; a decree of foreclosure ordering the sale of the mortgaged properties; and a judgment granting attorney fees and costs.[3] Jefferson filed a timely appeal.

## II.
## ISSUES ON APPEAL

I.      Did the Bank breach an agreement to take a second position security interest in the Eighty Acre Parcel?
II.     Did the Bank breach the implied covenant of good faith and fair dealing?
III.    Did the Bank intentionally interfere with a prospective economic advantage?
IV.     Did the Bank commit fraud?
V.      Did the district court improperly dismiss Jefferson's promissory estoppel claim?
VI.     Did the district court err in finding that a series of novations occurred?
VII.    Did the district court err in determining that the Bank's mortgages should be foreclosed?
VIII.   Is either party entitled to attorney fees on appeal?

## III.
## DISCUSSION

### A. Standard of Review.

This Court employs the same standard as the district court in reviewing a grant of summary judgment. *Buku Properties, LLC v. Clark*, 153 Idaho 828, 832, 291 P.3d 1027, 1031 (2012). Summary judgment is proper when "the pleadings, depositions, and admissions on file,

---

[3] It is unclear why it was necessary to enter two separate judgments. The first judgment, entered on January 17, 2012, appears to have been premature and not particularly in compliance with I.R.C.P. 54(a). It decides the issue of attorney fees and costs, even though the parties had 14 days from entry to submit their respective requests for the same. I.R.C.P. 54(d)(5) and 54(e)(5). Further, that judgment does not appear to state the relief to which the Bank was entitled but, rather, essentially summarized the provisions of the memorandum decision and order. The decree of foreclosure appropriately set out the relief to which the Bank was entitled but the second judgment, also entered on April 19, dealt solely with the award of attorney fees and costs. The first judgment could easily have been foregone and the second judgment could have set out the critical relief portions of the decree of foreclosure.

3

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c). "If the evidence reveals no disputed issues of material fact, then only a question of law remains, over which this Court exercises free review." *Conway v. Sonntag*, 141 Idaho 144, 146, 106 P.3d 470, 472 (2005).

**B. The Bank did not breach an agreement to take a second position security interest in the Eighty Acre Parcel.**

Jefferson contends that the Bank agreed to take a second position security interest in the Eighty Acre Parcel and subsequently breached the agreement by requiring that it satisfy and discharge the D.L. Evans mortgage as a condition of obtaining the loan. It proffers two theories in support of this contention. Jefferson first alleges that the initial mortgage, which it signed on May 10, 2006 (the "Mortgage"), explicitly stated such an agreement. Alternatively, Jefferson contends that the parties reached some sort of pre-commitment oral agreement to that same effect.

1. The Mortgage.

Jefferson argues on appeal that "[t]he Mortgage provided that encumbrances of record, such as the [D.L. Evans mortgage], would have priority over the lien of the Bank's Mortgage." This contention is based on the following language in the Mortgage:

> 6. WARRANTY OF TITLE. Mortgagor covenants that Mortgagor is lawfully seized of the estate conveyed by this Mortgage and has the right to grant, bargain, convey, sell, and mortgage the Property and warrants that the Property is unencumbered, except for encumbrances of record.
> . . . .
>
> 8. PRIOR SECURITY INTERESTS. With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property and that may have priority over this Mortgage, Mortgagor agrees:
> A. To make all payments when due and to perform or comply with all covenants.
> B. To promptly deliver to Lender any notices that Mortgagor receives from the holder.
> C. Not to make or permit any modification or extension of, and not to request or accept any future advances under any note or agreement secured by, the other mortgage, deed of trust or security agreement unless Lender consents in writing.

4

In essence, Jefferson's argument is that since these two provisions make reference to existing encumbrances, the Bank's Mortgage was subject to any existing encumbrance, including the D.L. Evans mortgage.

The Bank counters that this argument was not raised in district court and should not be considered on appeal. The Bank presents a series of other counterarguments in the alternative—that the Mortgage does not say what Jefferson claims it does; that there were no existing encumbrances to be subordinate to at the time the Mortgage was executed; and that the Mortgage was not subscribed by the Bank and thus is barred by the Statute of Frauds.

This Court has repeatedly held: "To properly raise an issue on appeal there must either be an adverse ruling by the court below or the issue must have been raised in the court below, an issue cannot be raised for the first time on appeal." *Garner v. Bartschi*, 139 Idaho 430, 436, 80 P.3d 1031, 1037 (2003) (quoting *McPheters v. Maile*, 138 Idaho 391, 397, 64 P.3d 317, 323 (2003)). Thus, since this argument was not presented to the district court, we will not consider it on appeal.[4]

2. Statute of Frauds.

For summary judgment purposes, the district court assumed:

> that the Bank agreed to loan money in accordance with the terms and conditions of the Board of Trustees approval of Jefferson's loan application [and] that the conditions of the loan agreement provided, among other things, that the Bank would be secured on the 80 Acre parcel in a second priority position.

In other words, the court accepted Jefferson's contention that the Bank made a pre-commitment promise to lend and take a second priority position on the Eighty Acre Parcel.[5] But, since the "promise to loan money involved much more than $50,000," the court concluded that it needed

---

[4] Even if the argument had been properly presented below, the argument simply does not wash. Paragraphs 6 and 8 of the Mortgage are boilerplate provisions that say nothing about the priority of the Bank's security interest. Paragraph 6 merely sets out standard terms regarding warranty of title, while paragraph 8 sets out typical covenants regarding payment of existing secured creditors. These provisions do not state that the Bank will take a second priority position and, even if they did, the Bank correctly notes that by the time the Mortgage was executed there was no prior mortgage of record—the D.L. Evans mortgage had already been paid, satisfied and discharged by Jefferson.

[5] What Jefferson seems to arguing is that the Bank's approval of the loan on May 9 was the loan commitment, but that prior to the commitment the Bank, acting through Worton, had agreed with the terms of the application submitted by Jefferson—that the Bank would take a second priority mortgage on the Eighty Acre Parcel. One must keep in mind that the application, as indicated in footnote 1, consisted of an oral presentation and a binder of documents. No particular writing has been identified by Jefferson as containing the proposal for a second position mortgage.

5

to consider the Statute of Frauds to determine the breach of contract claim. The court concluded that because the alleged pre-commitment promise was not in writing it was barred by the Statute of Frauds so there was no valid contract to breach.

Jefferson argues on appeal that the Mortgage was the written document reflecting the pre-commitment, which would thus satisfy the Statute of Frauds. It then argues that if the Statute of Frauds bars anything, it bars the Bank's statements that it "would require the subordination of the 80 Acre mortgage or that it would have to be in a first security position on the property." Alternatively, Jefferson contends that the Statute of Frauds, to the extent it applies, would only bar the actual promise to loan money, as opposed to the part of the agreement establishing the Bank's priority position.

The Bank responds in agreement with the district court. It argues that the Statute of Frauds requires any promise or commitment to loan $50,000, or more, to be in writing, whatever it is called. Because any alleged pre-commitment was oral, the Bank contends that it is barred by the Statute of Frauds.

Idaho's Statute of Frauds is set forth at I.C. § 9-505. It provides in relevant part that:

In the following cases the agreement is invalid, unless the same or some note or memorandum thereof, be in writing and subscribed by the party charged, or by his agent. Evidence, therefore, of the agreement cannot be received without the writing or secondary evidence of its contents:
. . . .
5. A promise or commitment to lend money or to grant or extend credit in an original principal amount of fifty thousand dollars ($50,000) or more, made by a person or entity engaged in the business of lending money or extending credit.

I.C. § 9-505. In applying this statute to a case with similar facts, this Court held an oral agreement to lend $50,000 or more to be "invalid because it clearly violates I.C. § 9-505(5)." *Lettunich v. Key Bank Nat. Ass'n*, 141 Idaho 362, 367, 109 P.3d 1104, 1109 (2005).

The transaction at issue in *Lettunich* was quite similar to this one. *Id* at 365, 109 P.3d at 1107. There, the borrower, Lettunich, approached the defendant bank to negotiate a loan for the purpose of buying out his partner's interest in a cattle operation. *Id.* Three loans exceeding $50,000 were negotiated—one for real estate, a term loan to purchase cattle, and an operating line of credit for the cattle business—and the bank sent Lettunich a separate commitment letter for each loan. We stated that the commitment letters did not satisfy the writing requirement of I.C. § 9-505(5) because they were never executed by the proper parties. *Id.* at 367, 109 P.3d at

1109. Nevertheless, Lettunich contended that the bank had orally contracted to loan him the funds necessary to pay for cattle he purchased at a partnership dispersion auction because of assurances given to him by a bank representative both before and during the sale. *Id.* at 365−66, 109 P.3d 1107−08. In an affidavit, Lettunich stated that the bank representative repeatedly assured him the bank would "finance the purchase of the cattle," that the representative told him to "continue to purchase the cattle at the sale" when he sought further assurances, and that he "never would have purchased the cattle at the dispersion sale if [he] had known [the bank] was not going to honor its commitment." *Id.* at 366, 109 P.3d at 1108. However, after Lettunich had committed to buy over $400,000 in cows, the bank ultimately "refused to fund the cattle term loan and operating line of credit." *Id.* The Court held that the Statute of Frauds disposed of the matter, saying:

> Lettunich argues there was an oral agreement between the parties. Viewing the evidence in a light most favorable to Lettunich, even if we infer there was an oral agreement between the parties at least as far as loaning money to purchase cattle, the oral agreement is invalid because it clearly violates I.C. § 9-505(5).

*Id.* at 367, 109 P.3d at 1109. Even though Lettunich presented a more compelling case for relief than Jefferson has, he was unable to avoid the Statute of Frauds bar without a sufficient writing.

The Statute of Frauds bars any breach of contract claim here. Assuming, as the district court did, that there was in fact a pre-commitment to loan money and that the Bank agreed to take a second position on the Eighty Acre Parcel, no one claims that such an agreement was in writing. Indeed, Morrison stated repeatedly throughout his deposition that the alleged pre-commitment was not in writing:

> Q. [Bank's Counsel] Now, back to this idea of, as you called it, kind of a precommitment, was there a precommitment given to you in writing?
> A. [Morrison] There was nothing given to me in writing.
> Q. So this precommitment idea that you are referring to again related to what you claim Steve Worton told you?
> A. Everything was related to what Steve Worton told me because there wasn't one thing in writing, nothing. There wasn't an approval in writing, there wasn't a list of conditions in writing, contingencies in writing. There wasn't a formal request in writing. Nothing was in writing.
> . . . .
> Q. I am asking about this what you called kind of this preapproval, on this April 25 approval when Steve Worton called you.
> A. Yes. Like I said, I don't know if it was April 25, but it was prior to [May 9].
> Q. But, again, that wasn't in writing.

7

A. No.

Q. Nothing in writing that said that the bank would take a second position of that property.

A. No.

As in *Lettunich*, any pre-commitment from the Bank to lend Jefferson $2.8 million[6] and take a second position on the Eighty Acre Parcel would have had to be in writing. Because no writing exists, the Statute of Frauds bars any alleged oral agreement.

With regard to Jefferson's contention that the Statute of Frauds only bars enforcement of a promise to loan money, but not an agreement as to the priority to a security interest, we note two insurmountable hurtles. First, in a mortgage lending transaction the priority of a security interest is a critical and integral part that cannot be separated from the rest of the agreement. Both parties contend that the security provisions were a critical part of this transaction, although they disagree as to what those provisions were. Thus, the security provisions were an essential term of the lending agreement. *See Chapin v. Linden*, 144 Idaho 393, 397, 162 P.3d 772, 776 (2007) ("[O]nce parties attempt to provide for security it becomes an essential term of the contract.") Second, the best evidence of the actual agreement of the parties regarding priority is what actually occurred in the transaction. Here, Jefferson discharged the D.L. Evans mortgage prior to closing and the Bank took a first mortgage on both parcels of Project property. Without a writing that complies with the provisions of I.C. § 9-505(5) to prove that the actual agreement of the parties was to the contrary, Jefferson has absolutely no grounds to assert a breach of contract claim.

In sum, there are no disputed material facts that show the Bank made a loan pre-commitment or other oral agreement that complied with the Statute of Frauds. We thus hold that the Bank did not breach any agreement and affirm the district court's conclusion in that regard.

## C. The Bank did not breach the implied covenant of good faith and fair dealing.

Jefferson alleges that the Bank breached the implied covenant of good faith and fair dealing by "changing its position and requiring Jefferson to pay off the existing loan on the 80 Acre parcel." The district court did not directly address this issue, nor did the Bank. But, because the Bank acted in accordance with the parties' agreement, we hold that the Bank did not breach the implied covenant.

---

[6] Jefferson contended that the oral agreement was for a loan of $2.8 million with a second position on the Eighty Acre Parcel. However, he acknowledges that the Bank only agreed to lend $2.2 million. Jefferson seems to concede that it agreed to this alteration in the terms of the alleged pre-commitment agreement.

Idaho law "implies a covenant of good faith and fair dealing when doing so is consistent with the express terms of an agreement between contracting parties." *Noak v. Idaho Dep't of Correction*, 152 Idaho 305, 309, 271 P.3d 703, 707 (2012). "When it is implied, '[t]he covenant requires that the parties perform, in good faith, the obligations imposed by their agreement.'" *Id.* (quoting *Idaho Power Co. v. Cogeneration, Inc.*, 134 Idaho 738, 750, 9 P.3d 1204, 1214 (2000)). Such a claim may only be asserted by parties to a contract. *Id.* Even then, one can maintain a claim for breach of the covenant only when he or she 'is denied the right to the benefits of the agreement [the parties] entered into.'" *Id.*

Jefferson simply cannot show that it was denied the benefit of any valid contract provision. As discussed above, the Bank did not agree that it would take second position on the Eighty Acre Parcel, nor did it agree that it would never change its position during the course of negotiations. As for the Bank "requiring" Jefferson to pay off the existing loan, the choice to do so was ultimately Jefferson's:

> Q. [Bank's Counsel] Whenever it was, were you at that point committed to accept
> that loan from the Bank of Commerce?
> A. [Morrison] Yes.
> Q. So you had to accept the loan?
> A. In a practical sense, yes, because I had to perform by a certain date, and I
> hadn't been pursuing a loan with anybody else.
> Q. But I am saying legally were you obligated—
> A. No.
> Q. You weren't obligated to accept the loan that the bank gave you.
> A. Not legally; I could have lost the project.

Morrison's admissions show that Jefferson was not in fact required to pay off the D.L. Evans mortgage. Had he wished not to, he should have simply not taken the loan. His decision to take the loan does not itself create a material issue of fact that the Bank acted in bad faith. We thus affirm the district court's holding that the Bank did not breach the implied covenant of good faith and fair dealing.

**D. The Bank did not intentionally interfere with a prospective economic advantage.**

The district court found that the Bank did not "intentionally propose . . . a loan that would interfere with and cause Jefferson to lose any economic expectancy." Thus, the court concluded Jefferson could not prove its claim for intentional interference with a prospective economic advantage. Jefferson contends that the Bank did intentionally interfere with a prospective economic advantage by requiring the D.L. Evans loan to be paid off, "inducing termination of

[Jefferson's] economic expectancy." It bolsters this by further arguing that "Worton also knew at the time of the closing that the only likely source of money to pay off the 80 Acre encumbrance would have been from Jefferson's working capital." Thus, Jefferson concludes, the Bank's "actions in reducing Jefferson's ability to service the Bank's loan" ultimately led to "catastrophic loss." The Bank responds that, as found by the district court, there is no proof the Bank intentionally interfered with Jefferson's economic expectancies.

A plaintiff seeking to establish a claim for intentional interference with a prospective economic advantage "must show (1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted." *Cantwell v. City of Boise*, 146 Idaho 127, 137–38, 191 P.3d 205, 215–16 (2008); *see also Highland Enter., Inc. v. Barker*, 133 Idaho 330, 338, 986 P.2d 996, 1004 (1999). With respect to the third element, intentional interference, this Court has held that "the plaintiff may show that the interference 'with the other's prospective contractual relation is intentional if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.'" *Highland*, 133 Idaho at 340, 986 P.2d at 1006. We further clarified that "[i]ntent can be shown even if the interference is incidental to the actor's intended purpose and desire 'but known to him to be a necessary consequence of his action.'" *Id.* Because "[w]hat motivates a person to act seldom is susceptible of direct proof," culpable intent may be inferred from conduct substantially certain to interfere with the prospective economic relationship. *Id.*

The *Highland* Court applied these rules in examining an environmental group that engaged in "direct action" activism—"non-violent protest of road building and timber harvesting such as burying people in the road, erecting tripods in the road and sitting in the tripod, and chaining people to equipment and gates in order to block work." *Id.* at 335, 986 P.2d at 1001. The Court noted that the defendants were not directly targeting the plaintiff with these actions, and the defendants indeed testified that "the intention was not to deprive Highland of, you know, a major portion of their economic activities." *Id.* at 340, 986 P.2d at 1006. Even so, the defendants realized that their "activities also affected Highland even though Highland was not the direct target." *Id.* We concluded that:

10

> It is reasonable to infer from the evidence of the appellants' conduct presented at trial that the conduct was substantially certain to interfere with an economic advantage. The substantially certain aspect of appellants' conduct allows a finding of intent. Even more, regardless of the assertion that Highland was not the intended target of their activities and saving the trees was the ultimate objective, intent can be shown even if the interference is incidental to the actor's intended purpose and desire, but known to him to be a necessary consequence of his action. A reasonable conclusion from the appellants' activities is that even if they intended only to harm the Forest Service and preserve the Cove/Mallard area, a necessary consequence of their actions would be that those constructing the roads would suffer financially.

*Id.* at 340–41, 986 P.2d at 1006–07. This Court thus held that substantial evidence supported a conclusion that the *Highland* defendants intended to terminate Highland's prospective economic advantage. *Id.*

Here, the Bank did not intentionally interfere with Jefferson's prospective economic advantage because, as the district court concluded, the intent element is missing. Jefferson simply argues that the Bank's insistence that Jefferson pay off the D.L. Evans loan on the Eighty Acre Parcel was intentional interference. But this does not rise to the level of intentional interference as set forth in *Highland*.

The Bank's purported interference was not an act of sabotage or mischief as in *Highland*, but an insistence on a certain set of loan terms, and this insistence alone would not imply that Jefferson would "suffer financially" as a necessary consequence. For all the Bank knew, Jefferson could have simply declined the Bank's offer and found financing elsewhere. Or, it could reasonably have assumed that Jefferson was not foolish enough to take a loan that Morrison knew his company could not possibly repay. Jefferson's argument appears to boil down to a contention that the Bank acted in bad faith simply because it did not vigorously try to discourage the company from taking a loan that Morrison realized was risky from the start—that is, that the Bank should have saved Jefferson from itself. In any case, simply because the Bank presented Jefferson with financing terms it preferred—which Jefferson accepted, and which ultimately did not work out in its favor—does not lead to an inference that the Bank knew that Jefferson would suffer financially. Indeed, the terms offered by the Bank, and accepted by Jefferson, are essentially the same as had been extended by D.L. Evans—a $2.2 million loan where D.L. Evans already held first position on one parcel and would obtain it on the other. There is no indication that either bank had some nefarious intent to cause injury to Jefferson or to

cause its Project to fail by extending or proposing such terms. Jefferson has proposed no motive on the part of the Bank for wishing to cause Jefferson's Project to fail—a result which would require the Bank to pursue extended litigation to foreclose upon its mortgages. Therefore, we hold that there was no intentional interference on the part of the Bank and accordingly affirm the district court's determination of this claim.

### E. Jefferson failed to make a showing of fraud.

The district court found that the Bank did not commit fraud because there was no evidence of a false statement, or reliance on the part of Jefferson, regarding: 1) the Bank taking a second position on the Eighty Acre Parcel; or 2) an alleged promise to provide further financing. Jefferson argues to the contrary, claiming the Bank and its officers "made the materially false representation that the Bank had agreed to accept a second lien position on the 80 Acre parcel allowing Jefferson to profit . . . from the existing favorable financing arrangement and to preserve its ability to use its liquid assets." It contends that there is "abundant circumstantial evidence" of fraudulent intent, but unhelpfully, does not provide citations to the record to back up this claim. The Bank responds that the district court correctly found no evidence of several of the required elements of fraud.

For a fraud claim to succeed a plaintiff must "establish nine elements with particularity: (1) a statement or a representation of fact; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity; (5) the speaker's intent that there be reliance; (6) the hearer's ignorance of the falsity of the statement; (7) reliance by the hearer; (8) justifiable reliance; and (9) resultant injury." *Chavez v. Barrus*, 146 Idaho 212, 223, 192 P.3d 1036, 1047 (2008) (citing *Lettunich*, 141 Idaho at 368, 190 P.3d at 1110). In *Chavez*, the plaintiff failed to establish that a title company made a false statement, that she was aware of any statement, that she relied on it, or that she suffered an injury as a result. *Id.* Accordingly, we concluded that the lower court did not err in dismissing her fraud claim. *Id.*

Similarly, Jefferson has not shown a genuine issue of material fact regarding its fraud claim. In particular, we find no evidence here that the Bank made an intentional misstatement of material fact. Jefferson states, with no citation to the record, that "[t]he Bank and its officers made the materially false representation that the Bank had agreed to accept a second lien position on the 80 Acre parcel," and that "the Bank intentionally or negligently concealed the fact that it would or could change its position" thereafter. The record provides no factual support for these

allegations. Furthermore, Jefferson claims that it "had the 'right to rely' on the misrepresentation made by the Bank that it would not allow Jefferson and the related businesses to fail and that the Bank would provide operating funds to Jefferson to that end." But Jefferson points to no evidence that shows the Bank ever made such a representation. Indeed, the sole colloquy used to support this allegation shows the contrary:

> A. [Morrison] Steve [Worton] says there is no way the bank wants [Jefferson] to fail, there is no way that the bank wants this to fail, there is no way the bank wants this as an asset. *So do whatever you think is the right thing for you to do, but if you do this, my hunch is that you will be able to come back into this bank and they will consider whatever your loss was. . . .* So we moved forward understanding that it would be the bank's effort to mitigate this impact of this new requirement on our business.
> Q. [Bank's Counsel] And that's based on what you claim Steve Worton told you?
> A. *He didn't say those words, but yes.*
> Q. And did he give you something in writing to that effect?
> A. He didn't give me anything in writing for anything.
> Q. So as I understood what you said, these are operating funds you think he was promising you?
> A. No. The ability to operate without those funds. I don't think he was promising it, I think he was using some common sense argument that there is no way that the bank won't do this.
> Q. So you didn't view that as a loan commitment from the bank?
> A. No, I didn't. It was just one penny of a dollar's worth of consideration on what to do at that crossroads at that point in the 11th hour.
> Q. Ultimately you decided that you would accept the terms that the bank offered and close the loan.
> A. Yes. But I mean there was a temporary atmosphere to that commitment, too.
> Q. What do you mean by that?
> A. Meaning I felt like that we would probably go back to the table afterwards and figure something else out. Because it was so clearly expressed to Steve that from a common sense point of view I cannot continue to operate my business as we are doing now without this working capital.
> Q. *Now, you say you thought there would be. Are you saying there was a commitment on the part of the bank?*
> A. *No.*
> Q. *That's just what you thought would happen.*
> A. *Yes.* That was a consideration that I made in choosing to do what I did.

(Emphasis added.) At best, this shows that Worton told Morrison that he had a "hunch" that the Bank would "consider" Jefferson's loss if he came back for additional funds—but Morrison testified that even this minimal commitment was not Worton's "exact words." Assuming Worton said something close to Morrison's approximation, he was prognosticating at best and not

promising to never change position, or promising to extend future financing. What Worton's exact words were are anyone's guess, but the undisputed evidence shows the Bank made no representations that it would not change its position, or that it would extend further funding. Rather, Morrison was relying on something he simply "thought would happen." Without evidence of a material misstatement of fact, the Bank could not have committed fraud. Thus, we affirm the district court's finding that no fraud occurred.

**F. The district court correctly dismissed Jefferson's promissory estoppel claim**.

The district court found that Jefferson's promissory estoppel claim failed for the same reason its breach claim failed: "no [loan] pre-commitment" was in writing. Because "there was no written pre-commitment agreement," there was also "no valid or definite agreement". Thus, the court found, Jefferson could not recover based on estoppel. Jefferson makes a convoluted argument on appeal, arguing again that the Mortgage terms were incorporated into the loan agreement, and offering conclusory statements, with no citations to the record, that the elements of promissory estoppel were met. The Bank agrees with the district court that there was no valid loan commitment prior to closing. "As such," it contends, "the Bank should not be estopped from denying a nonexistent agreement which would have violated the Statute of Frauds."

Promissory estoppel, generally speaking, means that "[a] promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise." *Smith v. Boise Kenworth Sales, Inc.*, 102 Idaho 63, 67–68, 625 P.2d 417, 421–22 (1981) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 90(1) (1973)). This Court has further found that:

> [A] party seeking to avail itself of the doctrine must show that: "(1) the detriment suffered in reliance was substantial in an economic sense; (2) substantial loss to the promisee acting in reliance was or should have been foreseeable by the promisor; and (3) the promisee must have acted reasonably in justifiable reliance on the promise as made."

*Id.* (quoting *Mohr v. Shultz*, 86 Idaho 531, 540, 388 P.2d 1002, 1008 (1964)).

In the *Lettunich* case, the plaintiff attempted to invoke the promissory estoppel doctrine under similar facts. There, a bank argued that, due to the Statute of Frauds, an alleged oral promise to lend could not be enforced. *Lettunich*, 141 Idaho at 366, 109 P.3d at 1108. Lettunich responded that, "promissory estoppel should be used in this case to prevent KeyBank from

14

denying the enforceability of an oral promise." *Id.* at 367, 109 P.3d at 1109. This Court noted that because the promise did not comply with the Statute of Frauds, "there was no complete promise . . . to be enforced." *Id.* We further explained that "[p]romissory estoppel is simply a substitute for consideration, not a substitute for an agreement between parties." *Id.* Accordingly, though Lettunich "clearly suffered a detriment when he purchased cattle without a way to pay for them," the "doctrine of promissory estoppel [was] of no consequence . . . because there [was] evidence of adequate consideration." *Id.* at 368, 109 P.3d at 1110. We reiterated that what was "lacking [was] a sufficiently definite agreement" and without such an agreement, estoppel was not appropriate. *Id.*

The *Lettunich* holding disposes of Jefferson's claim here. As noted above, any alleged oral pre-commitment from the Bank would not be valid for failure to comply with the Statute of Frauds. And just as promissory estoppel would not substitute for an invalid agreement in *Lettunich*, it will not do so here. Because there is "no complete promise . . . to be enforced" here, Jefferson is unable to avail itself of promissory estoppel. We thus affirm the district court's decision on this claim.

### G. Novation is not an issue.

In ruling on the Bank's motion for summary judgment, the district court found that a series of novations "changed the terms of the original loan application by Jefferson." However, it concluded that "ultimately Jefferson entered into a loan agreement with the Bank which extinguished all other pre-loan agreements that may have been contemplated by the parties." Jefferson disputes this on appeal arguing that "[i]ssues of fact arising from the circumstances of this case raise the issue of whether or not the elements necessary to find novation are present," without explaining those circumstances in detail or bothering to cite to the record. The Bank responds that even if a valid pre-loan commitment existed, "any such agreement was subsequently extinguished and substituted by the written $2.2 million agreement."

This Court has held that "novation is a species of accord and satisfaction," and one that "results when an accord and satisfaction is reached by substitution of a new agreement or performance in place of the performance or compromise of the original obligation." *Harris v. Wildcat Corp.*, 97 Idaho 884, 886, 556 P.2d 67, 69 (1976). Logically, for a novation to exist, there must first be a valid agreement to be substituted for.

Novation is not a relevant issue in this appeal. The district court apparently considered it an issue based on the assumption for summary judgment purposes that the oral agreement alleged by Jefferson did exist. But, the court then determined that the oral agreement was subsequently amended by the parties to result in the actual agreement that was carried out at closing—the Bank loaning $2.2 million and taking a first mortgage against both parcels. However, since any alleged oral agreement was barred by the Statute of Frauds, there was no valid agreement to be novated. No subsequent agreement complying with the Statute of Frauds exists. The question of novation is superfluous to the outcome of this case. This is simply a case where Jefferson applied for a $2.8 million loan with a first mortgage on one parcel and a second on the other, the Bank countered with an offer to loan $2.2 million with a first mortgage on both parcels, and Jefferson accepted and closed on the Bank's terms.

**H. The district court did not err in ordering foreclosure.**

In its final issue presented on appeal, Jefferson claims: "The District Court erred in determining that the Bank's Mortgage should be foreclosed in that there are disputed materials [sic] of fact that would have precluded the entry of summary judgment allowing the foreclosure." Jefferson presents no argument specifically in support of this issue, apparently assuming that it would necessarily follow if the Court were to reverse the judgment of the district court. Since we affirm, there are simply no grounds to find that the district court erred in ordering foreclosure of the mortgages.

**I. The Bank is entitled to attorney fees based on contract.**

The Bank claims entitlement to attorney fees on appeal, pointing out that in both of the notes and mortgages at issue here, Jefferson agreed to pay "all costs and expenses incurred by [the Bank] in enforcing or protecting [its] rights and remedies," including attorney fees and costs. "Where a valid contract between the parties contains a provision for an award of attorney fees, the terms of the contract establish a right to attorney fees." *Lamprecht v. Jordan, LLC*, 139 Idaho 182, 186, 75 P.3d 743, 747 (2003). Since the notes and mortgages provide that Jefferson must pay the Bank's attorney fees and costs, we award the Bank its fees and costs on appeal.

**IV.**
**CONCLUSION**

We affirm the decree of foreclosure and judgment and award the Bank its attorney fees and costs on appeal.

16

Chief Justice BURDICK, and Justices EISMANN, W. JONES and HORTON CONCUR.