# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 47138

BROCKETT COMPANY, LLC,
an Idaho limited liability company,

   Plaintiff-Appellant,

v.

SCOTT CRAIN, an individual; and
TEXOMA MFG, LLC, an Oklahoma
limited liability company,

   Defendants-Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, January 2021 Term

AMENDED
Opinion Filed: April 23, 2021

Melanie Gagnepain, Clerk

---

Appeal from the District Court of the Fourth Judicial District, State of Idaho, Ada County. Deborah A. Bail, District Judge.

The order of the district court is <u>reversed</u>, the judgment of the district court is <u>vacated</u>, and the case <u>remanded for further proceedings</u>.

Sasser & Jacobson, PLLC, Boise, for Appellant. S. Alex Roll argued.

Taylor Law Offices, PLLC, Boise, for Respondents. Christian S. Martineau argued.

---

BURDICK, Justice.

This case arises from an Idaho company's attempt to bring an action in Idaho against a resident of Oklahoma and a business located in Oklahoma. Brockett Company, LLC, ("Brockett Co.") appeals from a district court order setting aside a default judgment entered against Scott Crain and Texoma MFG., LLC ("Crain," "Texoma," or collectively "Respondents"). The district court set aside the default judgment after determining that it did not have personal jurisdiction over Crain or Texoma. On appeal, Brockett Co. argues that the district court erred in setting aside the default judgment by inappropriately considering an affidavit submitted by Crain, failing to consider facts in the record, and determining that it did not have personal jurisdiction over

1

Crain and Texoma. The Respondents contend that the district court did not err on any of these issues.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Brockett Co. is an Idaho limited liability company with its primary place of business in Ada County, Idaho. Brockett Co. is primarily in the business of buying and selling new and used storage tanks. Brockett Co. also serves as a broker or intermediary by procuring buyers for parties looking to sell tanks. After lining up a buyer, Brockett Co. will purchase the tanks from the seller, receive an invoice, sell the tanks to the buyer, and invoice the buyer directly.

Scott Crain is an Oklahoma resident and the owner of Texoma, an Oklahoma limited liability company. In 2015, Brockett Co. reached out to Crain in Oklahoma to negotiate the purchase of several "round-bottom" storage tanks owned by Texoma. Texoma had twenty-seven "round-bottom" tanks for sale. After communicating back and forth, Brockett Co. and Crain agreed to the purchase and sale of five tanks, which Brockett Co. then sold to a buyer in San Antonio, Texas.

The parties agree that in 2016 Brockett Co. attempted to negotiate a price for Texoma's remaining twenty-two tanks with Crain. However, the parties disagree as to whether an agreement was ever reached. Texoma ultimately sold the tanks directly to a Texas buyer instead of Brockett Co.

On July 13, 2017, Brockett Co. filed a complaint against Respondents alleging breach of contract, unjust enrichment, intentional interference with a prospective economic advantage, and fraudulent misrepresentation. Crain and Texoma were served in Oklahoma with a copy of the summons and complaint on July 26, 2017. Crain and Texoma failed to appear and Brockett Co. moved the district court to enter a default judgment in its favor. An evidentiary hearing was held on November 15, 2017, where the owner of Brockett Co., Daniel Brockett, testified.

At the hearing, Daniel[1] testified that after the initial five-tank transaction, Brockett Co. entered into a brokerage relationship with Texoma and he spent over a year actively trying to find a buyer for the remaining twenty-two tanks. He further testified that from the time of the initial transaction in 2015 until October of 2016, he and Crain communicated via text messages and telephone calls regarding the remaining twenty-two tanks. Daniel also testified that Crain had agreed to sell him the remaining twenty-two tanks for $15,000 each and that he had lined up

---

[1] To avoid confusion with Brockett Co., we refer to Daniel Brockett by his first name throughout this opinion.

2

a buyer in Texas, Johnson Specialty Tools, which would purchase the tanks from Brockett Co. for $24,500 each. Finally, Daniel testified that Crain met with the prospective buyers to show them the tanks but, despite having agreed not to cut Brockett Co. out of the deal, Crain informed Johnson Specialty Tools that Texoma would not sell the tanks to Brockett Co. and would instead sell the tanks directly to Johnson Specialty Tools.

On December 19, 2017, a default judgment was entered in favor of Brockett Co. in the amount of $209,000.00 plus pre-judgment interest. After the default judgment was entered, Crain and Texoma made a special appearance pursuant to Idaho Rule of Civil Procedure 4.1(b) to contest personal jurisdiction. The same day, Crain and Texoma filed a motion to set aside the default judgment.

In their supporting memorandum, Crain and Texoma argued that the default judgment should be set aside because Crain had been served with a procedurally defective summons and Texoma had not been served at all. Crain and Texoma did not include an in-depth argument regarding personal jurisdiction in their opening memorandum, stating only the following: "While Plaintiff's Complaint fails to provide any facts supporting it's [sic] position that this Court has jurisdiction over Defendants, both of which [sic] are Oklahoma residents, Defendants reserve those arguments for their subsequent motion to dismiss for lack of jurisdiction." Brockett Co. filed a memorandum in opposition to Crain and Texoma's motion. The district court set the matter for a hearing.

Crain and Texoma subsequently filed a reply memorandum arguing, among other things, that the default judgment should be set aside on the grounds that it was void because the district court lacked personal jurisdiction over them. Along with their reply memorandum, Crain and Texoma filed a sworn affidavit of Crain describing Texoma's business activities with Brockett Co.

In the affidavit, Crain acknowledged that Texoma sold the five tanks to Brockett Co. and delivered them to a third-party buyer located in Texas. However, he maintained that when Daniel reached out to him fifteen months later regarding the remaining twenty-two "round-bottom" tanks, they were unable to agree on an acceptable price and the negotiations ended without a sale. Finally, he contended that after the negotiations ended, a Texas buyer reached out to him, requesting a quote for the tanks and to inspect them. Texoma ultimately sold the twenty-two tanks to the Texas buyer.

3

Brockett Co. moved to strike the affidavit and those portions of Crain and Texoma's reply memorandum that relied upon the affidavit on the grounds that it was filed in violation of Idaho Rule of Civil Procedure 7(b)(3). Based upon the record before this Court, it appears that Brockett Co.'s motion to strike the affidavit was never addressed by the district court.

On January 18, 2019, the district court issued a decision and order setting aside the default judgment on the basis that it was void for lack of personal jurisdiction over Crain and Texoma. The district court subsequently entered a judgment vacating the previously entered default judgment and dismissing Brockett Co.'s claims.

Brockett Co. timely appealed.

## II. ISSUE ON APPEAL

Did the district court err in setting aside the default judgment in favor of Brockett Co. on the basis that it was void for lack of personal jurisdiction over Respondents?

## III. STANDARD OF REVIEW

Idaho Rule of Civil Procedure 55(c) indicates that a court may set aside a default judgment pursuant to Rule 60(b). I.R.C.P. 55(c). Rule 60(b)(4), in turn, provides that a court may relieve a party from a final judgment where "the judgment is void[.]" I.R.C.P. 60(b)(4). "In determining the appropriate standard of review for a motion for relief under Rule 60(b), the Court must consider what subsection of the rule is being invoked." *In Re SRBA Case No. 39576 Subase No. 37-00864*, 164 Idaho 241, 248, 429 P.3d 129, 136 (2018). "Whether a judgment is void is a question of law." *State, Dep't of Health & Welfare v. Housel*, 140 Idaho 96, 100, 90 P.3d 321, 325 (2004) (citation omitted). "This Court reviews questions of law de novo." *Pizzuto v. State*, 134 Idaho 793, 795, 10 P.3d 742, 744 (2000) (citation omitted). Finally, constitutional questions are reviewed de novo because they are purely questions of law. *Bradbury v. Idaho Jud. Council*, 136 Idaho 63, 67, 28 P.3d 1006, 1010 (2001) (citing *V–1 Oil Co. v. Idaho State Tax Comm'n*, 134 Idaho 716, 718, 9 P.3d 519, 521 (2000)).

## IV. ANALYSIS

The district court set aside the previously entered default judgment as void and dismissed Brockett Co.'s claims after determining that it lacked personal jurisdiction over Respondents. Brockett Co. argues on appeal that the district court erred in setting aside the default judgment and dismissing its claims by considering an affidavit submitted by Crain in support of the motion, failing to consider evidence in the record, and determining that it did not have personal jurisdiction over Respondents.

4

For an Idaho court to exercise personal jurisdiction over an out-of-state defendant, two requirements must be met: "(1) the act giving rise to the cause of action must fall within the scope of Idaho's long-arm statute, Idaho Code section 5-514; and (2) jurisdiction must not violate the out-of-state defendant's due process rights." *Gailey v. Whiting*, 157 Idaho 727, 730, 339 P.3d 1131, 1134 (2014) (citing *Knutsen v. Cloud*, 142 Idaho 148, 150, 124 P.3d 1024, 1026 (2005)). The district court determined it did not have personal jurisdiction over Respondents because the sale of tanks "to another buyer in another state" did not fall within the reach of Idaho's long arm statute and that the exercise of jurisdiction over Respondents would not have comported with the requirements of due process.

**A. Idaho's long-arm statute provides a basis for personal jurisdiction over Respondents.**

Idaho's long-arm statute provides for an Idaho court's exercise of personal jurisdiction over non-resident defendants. *Blimka v. My Web Wholesaler, LLC*, 143 Idaho 723, 726, 152 P.3d 594, 597 (2007). The long-arm statute states, in relevant part, that

> Any person, firm, company, association or corporation, whether or not a citizen or resident of this state, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits said person, firm, company, association or corporation, and if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of said acts:
>
> > (a) The transaction of any business within this state which is hereby defined as the doing of any act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact or enhance the business purpose or objective or any part thereof of such person, firm, company, association or corporation;
> >
> > (b) The commission of a tortious act within this state[.]

I.C. § 5-514(a)–(b). "The exercise of personal jurisdiction over out-of-state defendants who do any of the acts enumerated in Idaho Code section 5-514 extends only 'as to any cause of action arising from the doing of any of said acts.'" *Gailey*, 157 Idaho at 730, 339 P.3d at 1134 (quoting *Houghland Farms, Inc. v. Johnson*, 119 Idaho 72, 75, 803 P.2d 978, 981 (1990)).

Brockett Co. argues that the district court could have found a basis for exercising personal jurisdiction over Respondents in two ways. First, Brockett Co. argues that the district court could have exercised personal jurisdiction over Respondents under Idaho Code section 5-514(a) because they transacted business in the state. Second, Brockett Co. argues that the district

5

court could have exercised personal jurisdiction over Respondents under Idaho Code section 5-514(b) because they committed a tortious act within the state.

1.   <u>Respondents transacted business in Idaho as described under Idaho Code section 5-514(a).</u>

Under Idaho's long-arm statute, transacting business is defined as "the doing of any act for the purpose of realizing pecuniary benefit or accomplishing or attempting to accomplish, transact or enhance the business purpose or objective or any part thereof." I.C. § 5-514(a). Courts look to the specific facts of each case to determine whether an out-of-state defendant has transacted business within the state. *See Profits Plus Cap. Mgmt., LLC v. Podesta*, 156 Idaho 873, 882, 332 P.3d 785, 794 (2014). In determining whether a defendant transacted business in Idaho, the defendant's conduct is the critical inquiry. *Gailey*, 157 Idaho at 731, 339 P.3d at 1135.

This Court has previously held that an out-of-state defendant, which entered into a business relationship with another business with its principal place of business in Idaho, has transacted business in Idaho for the purposes of Idaho Code section 5-514(a). *Profits Plus*, 156 Idaho at 882–83, 332 P.3d at 794–95. In *Profits Plus*, an investment fund that specialized in the purchase and sale of precious metals reached out to a New Jersey based company that specialized in raising capital for investment opportunities. *Id.* at 879, 332 P.3d at 791. Although the investment fund was incorporated in Delaware, its principal place of business and storage facilities were located in Idaho. *Id.* at 879, 883, 332 P.3d at 791, 795. The parties disagreed as to whether they reached an agreement for the New Jersey based company to provide services to the investment fund. *Id.* at 879, 332 P.3d at 791. After the New Jersey based company asserted that it had a fifty-percent ownership stake in the investment fund, the investment fund filed a declaratory action and the New Jersey based company made a special appearance to contest personal jurisdiction. *Id.* at 879–80, 332 P.3d at 791–92. Reasoning that the out-of-state defendant had engaged in a business relationship with the investment fund when it asserted a fifty-percent ownership interest, traveled to Idaho to inspect the investment fund's vault sites, and spoke with Idaho residents concerning the purchase of property in Idaho on behalf of the investment fund, this Court determined that the New Jersey based company had transacted business in Idaho as defined in section 5-514(a). *Id.* at 883, 332 P.3d at 795.

Though we did not explicitly state as much in *Profits Plus*, it is clear from the facts of the case—and implied in this Court's reasoning—that a party which enters into a business relationship with an Idaho-based business usually will have acted "for the purpose of realizing a

pecuniary benefit" or in furtherance of a business objective, and therefore, transacted business within the state.

In the present case, the parties agree that Brockett Co. purchased five storage tanks from Texoma and resold them to another buyer. They also agree that fifteen months later, they discussed the purchase and sale of Texoma's twenty-two remaining tanks. However, the parties characterize the result of their discussions and the fifteen months between the first transaction and the second alleged transaction differently. As discussed above, Daniel testified at the hearing on damages prior to the entry of default judgment that Respondents had entered into a brokerage relationship with Brockett Co. and that they had an agreement that Brockett Co. would work to secure an acceptable buyer for the remaining twenty-two tanks. Daniel also testified that Texoma agreed to sell the tanks to Brockett Co. at a specified price and that Brockett Co. secured the Texas buyer Texoma ultimately sold the tanks to directly. In his affidavit, Crain denied that a contract for the sale of the remaining twenty-two tanks ever existed between Brockett Co. and Texoma. He did not specifically deny the existence of a brokerage relationship between Brockett Co. and Texoma, simply characterizing Texoma's interactions with Brockett Co. as two isolated incidents, occurring fifteen months apart.

In determining that Idaho's long-arm statute did not provide it with personal jurisdiction over Respondents, the district court did not distinguish between Idaho Code sections 5-514(a) and 5-514(b). Nor did the district court determine whether Respondents had transacted business in Idaho as defined in section 5-514(a). Instead, the district court stated that no contract existed between Brockett Co. and Texoma without any discussion of Daniel's testimony. Having determined that there was no contract, the district court concluded that "[t]he defendants' actions of selling tanks they owned to another buyer in another state does not fall within Idaho's long-arm statute's reach."

Brockett Co. argues the district court either failed to consider Daniel's testimony or failed to construe conflicting testimony in its favor. We agree.

On appeal from an order and judgment dismissing an action for want of personal jurisdiction, the non-moving party below is entitled to have the evidence viewed "in the light most favorable to [them], and . . . are entitled to all reasonable inferences which can be drawn from facts established by their case in chief." *Intermountain Bus. Forms, Inc. v. Shepard Bus. Forms Co.*, 96 Idaho 538, 540, 531 P.2d 1183, 1185 (1975) (citations omitted); *see also Saint*

7

*Alphonsus Reg'l Med. Ctr. v. Washington*, 123 Idaho 739, 741, 852 P.2d 491, 493 (1993); *State ex rel. Wasden v. Native Wholesale Supply Co.*, 155 Idaho 337, 340, 312 P.3d 1257, 1260 (2013). This same standard applies to appellate review of factual questions presented by conflicting affidavits. *Intermountain Bus. Forms, Inc.*, 96 Idaho at 540, 531 P.2d at 1185.

We fail to see how the district court could have correctly applied these longstanding evidentiary standards and simultaneously determined that there was no agreement between the parties. Brockett Co. and Respondents presented conflicting testimony regarding whether a contract existed for the sale of the remaining twenty-two tanks. Though Respondents argue that text messages offered by Brockett Co. do not constitute a contract between the parties, even if true, their argument does not negate Daniel's testimony that a contract existed. Furthermore, Daniel's testimony that the parties were in a protracted, fifteen-month brokerage relationship for the sale of the remaining twenty-two tanks was uncontradicted by Crain's affidavit. Viewing the conflicting evidence in a light most favorable to Brockett Co., at least for purposes of deciding this issue of personal jurisdiction, we can assume the existence of both a fifteen-month brokerage relationship and a contract between the parties for the purchase and sale of the remaining twenty-two tanks. Therefore, the district court erred in failing to view the evidence before it in a light favorable to Brockett Co. as the non-moving party and in construing the evidence to the contrary.

Turning to the application of Idaho Code section 5-514(a), we conclude that Respondents transacted business in Idaho as defined in the long-arm statute. A contract is not a requirement for the exercise of personal jurisdiction under Idaho Code section 5-514(a). The out-of-state defendant must merely engage in an act "for the purpose of realizing pecuniary benefit" or in furtherance of a business purpose. I.C. § 5-514(a). Though Crain did not travel to Idaho like the out-of-state defendant in *Profits Plus*, he directly communicated with Daniel in Idaho through electronic means. According to Daniel's testimony, the parties spent fifteen months communicating back and forth via phone calls and text messages regarding Brockett Co.'s progress in selling Texoma's tanks. Respondents' communications, directed at Daniel in Idaho, including discussion of the tanks, price, and potential buyers, were solely in furtherance of a business purpose. That is, the sale of the remaining twenty-two tanks to Brockett Co. Accordingly, we conclude that Respondents transacted business in Idaho as defined by section 5-514(a) of Idaho's long-arm statute.

2. The tortious conduct alleged against Respondents falls within the reach of section 5-514(b) of Idaho's long-arm statute.

"Idaho's long-arm statute extends jurisdiction to 'the commission of a tortious act within this state.'" *Gailey*, 157 Idaho at 731, 339 P.3d at 1135 (quoting I.C. § 5-514(b)). To invoke the tortious act prong of Idaho's long-arm statute, "an allegation that an injury has occurred in Idaho in a tortious manner is sufficient." *Saint Alphonsus Reg'l Med. Ctr.*, 123 Idaho at 743, 852 P.2d at 495 (citations omitted). In other words, the tortious conduct must have been directed at a plaintiff in Idaho and the injury must actually have occurred in the state. *Blimka*, 143 Idaho at 726–27, 152 P.3d at 597–98.

For example, in *Blimka*, an out-of-state defendant's conduct fell within the reach of section 5-514(b) where the defendant made fraudulent misrepresentations to an Idaho plaintiff and the resulting injury was suffered in Idaho. 143 Idaho at 727, 152 P.3d at 598. Blimka was an Idaho resident who filed an action in Idaho against a small Maine-based company that was using the internet to advertise and sell its products on a national scale. *Id.* at 725, 152 P.3d at 596. The company did not actively solicit customers but maintained an automatic "listserv" through which it marketed its products to its subscribers via email. *Id.* After discovering the company on the internet and subscribing to its listserv, Blimka received an email advertising the sale of jeans in bulk. *Id.* He called the company and negotiated the purchase of 26,500 pairs of jeans. *Id.* Blimka was invoiced for the jeans and he wired payment to the company in Maine. *Id.* The jeans were shipped to him in Idaho. *Id.* Believing the jeans did not conform to representations made by the seller over the phone regarding quality, retail value, and packaging, Blimka rejected them. *Id.* Blimka subsequently filed suit in Idaho, the company failed to appear, and a default judgment was entered against it. *Id.* at 725–26, 152 P.3d at 596–97. The company subsequently made a special appearance claiming the judgment was void for lack of personal jurisdiction. *Id.* at 726, 152 P.3d at 597. The district court denied the motion. *Id.* On appeal, this Court reasoned that the company did not have to be physically present in the state in order to have acted within the state. *Id.* at 726–27, 152 P.3d at 597–98. Instead, it was sufficient that the company had allegedly made fraudulent representations to Blimka in Idaho through electronic means and that he sustained injury in Idaho when he learned of the misrepresentation upon delivery of the jeans. *Id.* at 727, 152 P.3d at 598. Thus, the tortious act prong of Idaho's long-arm statute is invoked where an Idaho plaintiff alleges that an out-of-state defendant directed fraudulent misrepresentations toward him in Idaho that result in an injury to him in this state.

9

In contrast, a defendant's conduct does not fall within the reach of the tortious act prong of Idaho's long-arm statute when the alleged tortious conduct was not directed at Idaho or an Idaho-resident plaintiff. *See Gailey*, 157 Idaho at 731–32, 339 P.3d at 1135–36. In *Gailey*, an Oregon resident traveled to Idaho and purchased a life insurance policy from an insurance agent who was an Idaho resident. *Id.* at 729, 339 P.3d at 1133. Seventeen years later, the insurance agent moved to Hawaii, became a resident there, surrendered his Idaho license, and switched the status of his Hawaii license from non-resident to resident. *Id.* Later that same year, the Oregon resident called the insurance agent, believing him still to be in Idaho, and asked for advice regarding the life insurance policy. *Id.* The insurance agent gave the Oregon resident allegedly negligent advice regarding the life insurance policy, and the Oregon resident filed a complaint against him in Idaho. *Id.* The insurance agent specially appeared and argued that the Idaho district court could not exercise personal jurisdiction over him. *Id.* The district court and this Court agreed, reasoning that the tort had not been committed in Idaho when the allegedly negligent communication regarding the life insurance policy—i.e., the tortious conduct—was directed at an Oregon resident, in Oregon, by a resident of Hawaii while in Hawaii. *Id.* at 732, 339 P.3d at 1136.

Here, Brockett Co. alleges Respondents fraudulently misrepresented that they would not cut Brockett Co. out of the transaction by quoting or selling the tanks directly to Brockett Co.'s Texas buyer, and that Respondents intentionally interfered with Brockett Co.'s prospective economic advantage by refusing to sell them to Brockett Co. and instead selling them directly to the buyer.

With respect to Brockett Co.'s fraudulent misrepresentation claim, we find this case nearly identical to *Blimka*. Like *Blimka*¸ where the out-of-state defendant directed communications—in the form of assurances regarding the quality of a product—at an Idaho resident, here, Respondents allegedly directed communications—in the form of assurances that they would not undercut them—at Brockett Co., an Idaho business. Also as in *Blimka*, where the Idaho resident sustained injury in Idaho when he learned that the jeans shipped to him did not conform to representations made by the seller, here, Brockett Co. allegedly sustained injury in Idaho when Respondents reneged on their agreement to sell Brockett Co. the storage tanks. That Brockett Co. intended to resell the tanks shortly after purchasing them does not change our analysis, nor did it change the analysis in *Blimka*. *See* 143 Idaho at 728, 152 P.3d at 599

10

(explaining that Blimka intended to market the 26,500 pairs of jeans rather than wear them). Furthermore, this case is distinguishable from *Gailey* because in *Gailey* the tortious conduct, i.e., the negligent advice was directed at an Oregon resident rendered by a Hawaii resident. Such communications were outside the reach of Idaho's long-arm statute because they were not directed at anyone within the forum. In the present case, the allegedly fraudulent communications were directed at an Idaho business, bringing the conduct squarely within the reach of Idaho's long-arm statute.

Brockett Co.'s intentional interference with a prospective economic advantage claim also falls within the reach of Idaho's long-arm statute. The prospective economic advantage that Respondents allegedly interfered with was Brockett Co.'s potential sale of the tanks to the Texas buyer. Respondents argue that the sale of storage tanks by one out-of-state party to another out-of-state party simply does not fall within the reach of Idaho's long-arm statute. However, this argument oversimplifies the nature of the alleged tort.

A successful claim for intentional interference with a prospective economic advantage requires the establishment of six elements:

> (1) the existence of a valid economic expectancy, (2) knowledge of the expectancy on the part of the interferer, (3) intentional interference inducing termination of the expectancy, (4) the interference was wrongful by some measure beyond the fact of the interference itself, and (5) resulting damage to the plaintiff whose expectancy has been disrupted.

*Wesco Autobody Supply, Inc. v. Ernest*, 149 Idaho 881, 893, 243 P.3d 1069, 1081 (2010) (quoting *Cantwell v. City of Boise*, 146 Idaho 127, 138, 191 P.3d 205, 216 (2008)). Brockett Co.'s economic expectancy, its sale of the tanks to the prospective buyer, was premised upon the existence of a contract between Brockett Co. and Texoma for the purchase of the same tanks. Brockett Co. could not expect to sell tanks that it did not possess. If an agreement did exist between Brockett Co. and Texoma for the purchase of the tanks, the sale of the tanks to the Texas buyer was an intentional failure to follow through with the original agreement. Thus, under the facts alleged by Brocket Co., Texoma's sale of the tanks to the Texas buyer was not simply a transaction between two out-of-state parties. The sale was also an act interfering with an economic expectancy that arose in Idaho, the disruption of which was felt by Brockett Co. in Idaho. Therefore, the alleged tortious conduct of Respondents falls within the reach of section 5-514(b) of Idaho's long-arm statute.

11

Because we conclude that Respondents' alleged conduct fell within the reach of both the transacted business prong and the tortious act prong of Idaho's long-arm statute, we further conclude that the district court erred in determining that it could not exercise personal jurisdiction over Respondents under Idaho Code section 5-514.

**B. The exercise of personal jurisdiction over Respondents comports with the requirements of due process.**

A state may exercise personal jurisdiction over an out-of-state defendant only when the defendant "has certain minimum contacts with the state such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Blimka v. My Web Wholesaler, LLC*, 143 Idaho 723, 727, 152 P.3d 594, 598 (2007) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). This requirement stems from the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *Id.* The "minimum contacts" test from *International Shoe* is satisfied where the defendant "'purposefully directs' his activities at residents of the forum state and the litigation arises out of or relates to those activities." *Houghland Farms, Inc. v. Johnson*, 119 Idaho 72, 76, 803 P.2d 978, 982 (1990) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)); *see also Saint Alphonsus Reg'l Med. Ctr. v. Washington*, 123 Idaho 739, 743–44, 852 P.2d 491, 495–96 (1993) (quoting *Schneider v. Sverdsten Logging Co.*, 104 Idaho 210, 212, 657 P.2d 1078, 1080 (1983) ("It is axiomatic that before a state can exercise jurisdiction over a non-resident defendant, the defendant must 'purposefully [avail] itself of the privilege of conducting activities in the forum state, thus invoking the benefits and protections of its laws.'"). In determining whether minimum contacts exist, "a court must focus on the relationship among the defendant, the forum, and the litigation." *Blimka*, 143 Idaho at 727, 152 P.3d at 598 (citing *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). "Once a court finds the requisite minimum contacts, it must then proceed to determine whether its assertion of personal jurisdiction comports with traditional notions of fair play and substantial justice." *Id.* (citation omitted).

In cases involving contractual disputes, the existence of a contract between a resident of the forum state and an out-of-state defendant does not automatically establish purposeful availment. *Profits Plus Cap. Mgmt., LLC v. Podesta*, 156 Idaho 873, 884, 332 P.3d 785, 796 (2014) (citing *Burger King Corp.*, 471 U.S. at 478). In evaluating whether an out-of-state defendant purposefully established minimum contacts with the forum state, courts must consider "prior negotiations, contemplated future consequences, the terms of the contract, and the parties'

actual course of dealing." *Id.* Thus, the United States Supreme Court has emphasized that defendants who "reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp.*, 471 U.S. at 473 (citations and internal quotations omitted).

In holding that personal jurisdiction existed in *Burger King Corp.*, the United States Supreme Court provided several reasons as to why a state may legitimately exercise personal jurisdiction over an out-of-state defendant who "purposefully directs" his activities toward residents of that state:

> A State generally has a "manifest interest" in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors. Moreover, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities; the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed. And because "modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity," it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity.
>
> . . . .
>
> Jurisdiction in these circumstances may not be avoided merely because the defendant did not *physically* enter the forum State. Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Id.* at 473–76 (internal citations omitted).

The Court provided this reasoning in 1985. Over thirty-five years later, with the widespread adoption of text messaging and internet-based communication, we find it all the more relevant.

We conclude that Respondents purposefully availed themselves of the privilege of conducting business in this state through their conduct directed at Brockett Co., which is sufficient to establish personal jurisdiction. Viewed in a light favorable to Brockett Co., the

evidence before the district court indicated that the parties engaged in a fifteen-month brokerage relationship, where Brockett Co. sought out potential buyers for Texoma's storage tanks, negotiated price, and coordinated the showing of the tanks to potential buyers. All of this was made possible by consistent back-and-forth communication between Brockett Co. and Crain on behalf of Texoma via electronic means. Although Crain's physical presence in Idaho would have provided additional support in determining that he purposefully availed himself and Texoma to the state's jurisdiction, that he did not set foot in Idaho does not preclude the exercise of personal jurisdiction. *Burger King Corp.*, 471 U.S. at 476. Had Respondents followed through with the brokerage relationship until its end, they would have continued to coordinate with Brockett Co. in Idaho until they found a suitable third-party buyer, at which time Respondents would have sold the tanks to Brockett Co. at the agreed-upon price. Thus, we disagree with Respondents' and the district court's characterization of the parties' dealings as a one-off contract. Properly construing the evidence in a light most favorable to Brockett Co., we conclude that Respondents, through their electronic communications directed at a forum resident, engaged in precisely the type of "continuing relationship and obligations" contemplated in *Burger King Corp.* As such, we further conclude that Respondents purposefully availed themselves of the privilege of conducting activities in Idaho.

Furthermore, in light of this Court's discussion of *Calder v. Jones*, 465 U.S. 783 (1984), in *Blimka*, Brockett Co.'s intentional tort claims against Respondents warrant further discussion of their contacts with the forum state. As discussed above, *Blimka* involved an Idaho resident's claim that a Maine-based company directed fraudulent misrepresentations at him in Idaho via electronic means regarding the quality of jeans that he ultimately purchased from it. 143 Idaho at 725–26, 152 P.3d at 596–97. In that case, we noted that the United States Supreme Court distinguishes between "untargeted negligence" and "intentional, and allegedly tortious, acts expressly aimed at the forum." *Id.* at 727–28, 152 P.3d at 598–99. And where an out-of-state defendant intentionally directs tortious conduct at an Idaho resident, and causes injury within the state, the Idaho resident need not travel to another jurisdiction to pursue his or her claim against the alleged tortfeasor. *Id.* at 728, 152 P.3d at 599.

Here, like in *Blimka*, Respondents are not accused of mere "untargeted negligence." Rather, it was alleged that Respondents committed fraud and intentionally interfered with a prospective economic advantage in Idaho. Specifically, Brockett Co. alleged that Respondents

14

intentionally misrepresented their intentions with respect to meeting with potential buyers and usurped Brockett Co.'s opportunity to resell the tanks to the Texas buyer. Although Respondents argue that this case is distinguishable from *Blimka* because, unlike the defendant in that case, they did not know that Brockett Co. was an Idaho company. We find the argument unavailing. With respect to the initial transaction for the purchase and sale of five tanks, Daniel testified that he sent Texoma a purchase order from Idaho, that Texoma invoiced Brockett Co. in Idaho, and that he wire transferred the money from Idaho to Respondents. Construing these facts in favor of Brockett Co., we can draw a reasonable inference that Respondents knew or should have known that Brockett Co. was an Idaho company by the time it sold the tanks to the Texas buyer fifteen months later. Therefore, like the defendant in *Blimka*, Crain and Texoma's "intentional, and allegedly tortious, actions were expressly aimed" at Idaho and they knew that the injury resulting from their actions would occur in Idaho. *Id.* at 727–28, 152 P.3d at 598–99. Accordingly, we further conclude that Respondents' actions satisfy the minimum contacts test with respect to the allegations of tortious conduct.

Having determined that the Respondents had sufficient minimum contacts with Idaho, this Court must now "consider those contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'traditional notions of fair play and substantial justice.'" *Profits Plus*, 156 Idaho at 884, 332 P.3d at 796 (quoting *Smalley v. Kaiser*, 130 Idaho 909, 913, 950 P.2d 1248, 1252 (1997)). We consider several factors under this analysis:

[1] the burden on the defendant,

[2] the forum State's interest in adjudicating the dispute,

[3] the plaintiff's interest in obtaining convenient and effective relief,

[4] the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and

[5] the shared interest of the several States in furthering fundamental substantive social policies.

*Id.* (quoting *Smalley*, 130 Idaho at 913, 950 P.2d at 1252). Furthermore, "[w]here 'a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (quoting *Burger King Corp.*, 471 U.S. at 477). Respondents argue that to require them to litigate a case in Idaho during an unprecedented national pandemic would

15

be to place an unreasonable burden on them, that the state of Oklahoma has a strong interest in determining what type of conduct engaged in by an Oklahoma company creates a binding contractual relationship or constitutes tortious conduct, and that Idaho's interest in protecting its citizens from tortious actions is diminished because Daniel no longer lives in Idaho.

As was the case in *Blimka*, Respondents purposefully directed their allegedly false representations into Idaho. In *Blimka*, we explained that "Idaho has an ever-increasing interest in protecting its residents from fraud committed on them from afar by electronic means." 143 Idaho at 728, 152 Idaho at 599. This State's interest in protecting its residents from fraud committed from another jurisdiction via electronic means is as compelling today as it was fourteen years ago. As such, Respondents should have reasonably anticipated that they might be haled into Idaho courts with respect to claims arising from their conduct. That Daniel no longer lives in Idaho does not diminish the State's interest in providing a forum for Idaho-based companies, such as Brockett Co., that allege the commission of intentional torts against them. Finally, with respect to Respondents' arguments regarding the unprecedented ongoing COVID-19 pandemic, we note that the national pandemic is just that, national. While we will not speculate as to any difference in difficulty or additional or lesser burden of litigating a case in Idaho as opposed to Oklahoma caused by COVID-19, we will point out that Idaho's courts are conducting many proceedings telephonically and via means of electronic communication where possible because of the pandemic. While the pandemic may have affected some court operations, it provides no basis for abandoning long-established jurisdictional rules. If anything, the possibility that Respondents may have been able to litigate some or all of this case without leaving Oklahoma diminishes the burden of being required to litigate the case in Idaho. *See Burger King Corp.*, 471 U.S. at 474 (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)) ("And because 'modern transportation and communications have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity,' it usually will not be unfair to subject him to the burdens of litigating in another forum for disputes relating to such activity."). Therefore, we conclude that the district court's exercise of personal jurisdiction over Respondents would have comported with "traditional notions of fair play and substantial justice."

In sum, we hold that Idaho's long-arm statute provided for the exercise of personal jurisdiction over Respondents and the Due Process Clause did not preclude the exercise of

personal jurisdiction in this case. As such, the district court erred in granting the Respondents' motion to set aside the default judgment on the basis that it lacked personal jurisdiction.

Brockett Co. also argues that the district court erred in considering Crain's affidavit because it was untimely under the Idaho Rules of Civil Procedure. However, we need not reach this argument on appeal because, even if we consider the affidavit, we conclude that the facts of this case, when properly construed, demonstrate that the district court had personal jurisdiction over Respondents.

## V. CONCLUSION

Based on the foregoing, we conclude that the district court erred in granting Respondents' motion to set aside the default judgment. Accordingly, we reverse the district court's order granting Crain and Texoma's motion to set aside the default judgment, vacate the district court's judgment dismissing Brockett Co.'s claims, and remand with instruction to reinstate the previously entered default judgment against Crain and Texoma. Costs on appeal are awarded to Brockett Co.

Chief Justice BEVAN, and Justices BRODY, STEGNER, and MOELLER **CONCUR.**

17